Mitchell D. Schweitzer, J.
This is an application by the District Attorney pursuant to sections 750 and 751 of the Judiciary Law to have the respondent, Milton Knapp, adjudged in contempt of court for refusing to answer certain questions asked of him upon his appearance as a witness before the third April, 1956, Grand Jury of this court.
Among the proceedings pending before that Grand Jury was one entitled “ People against John Doe, et al.,” an inquiry designed to determine whether the crimes of conspiracy (Penal Law, § 580), bribery of labor representatives (Penal Law, § 380) and extortion (Penal Law, § 850) were being committed or had been committed in this county. In the course of that inquiry, Milton Knapp, one of two partners conducting business as Eagle Reel & Manufacturer Co., was subpoenaed to appear *451 before the Grand Jury and to produce certain books and records. He appeared before the Grand Jury on April 23, 1956, was duly sworn and was asked the following question: “ Q. Now, who represented the union in these negotiations leading to a salary increase? ” The witness refused to answer that question, stating that he did so on the advice of his lawyer and on the ground that it might tend to incriminate him.
The Grand Jury thereupon voted to grant the witness immunity, in accordance with the provisions of section 2447 of the Penal Law, and at the express request of the District Attorney, the foreman of the Grand Jury directed the witness to answer the question. The witness, however, again refused to answer on the same ground of possible self incrimination. Two days later, on April 25, 1956, the witness reappeared before the Grand Jury and while under oath, was asked a series of questions, each of which he refused to answer on the ground of possible self incrimination, notwithstanding that the foreman of the Grand Jury, at the District Attorney’s request, directed the witness to answer each question, thereby assuring him of the immunity provided for by section 2447 of the Penal Law.
The questions thus put to the witness, which he refused to answer, were as follows: “ Q. Mr. Knapp, do you know a man named Philip Goldberg? Q. Mr. Knapp, do you know whether Philip Goldberg is an official of Local No. 239, International Brotherhood of Teamsters ? Q. Mr. Knapp, on or about October 28, 1955, did you give Philip Goldberg, a representative of Local No. 239, International Brotherhood of Teamsters, the sum of $500.00? Q. Mr. Knapp, I show you this check marked Grand Jury Exhibit No. 1 of today’s date in the sum of $500.00 and ask whether you recognize it? Q. Mr. Knapp, on or about October 28, 1955, did you go to the Public National Bank & Trust Company at 149th Street and Prospect Avenue and cash this check, Grand Jury Exhibit No. 1, and receive from the bank the sum of $500.00? Q. Mr. Knapp, on October 28, 1955, were you accompanied by Philip Goldberg, an official of Local No. 239, International Brotherhood of Teamsters, when you went to the Public National Bank & Trust Company located at 149th Street and Prospect Avenue? Q. Mr. Knapp, I again show you Grand Jury Exhibit No. 1 of today’s date and ask whether your handwriting appears on the face of that check? Q. Mr. Knapp, I show you a stub book that appears to be a check stub book, and I ask you to examine this check stub book and tell me whether your handwriting appears on the space of No. 2908, that is, the box? Q. Mr. Knapp, I direct your *452 attention to the box No. 2908, and I ask you to tell the Grand Jury what initial appears before the name, Goldberg? Q. Mr. Knapp, I ask whether Grand Jury Exhibit No. 2 of today’s date is in fact a stub book used by the Eagle Reel and Manufacturer Co. ? Q. Mr. Knapp, when was the last time you spoke to Philip Goldberg? Q. Do you know a man named Sam Goldstein? Q. Isn’t it a fact that Sam Goldstein is an official of Local No. 239, International Brotherhood of Teamsters? Q. Did you ever pay or give any sum'of money to Sam Goldstein? ”
The District Attorney and the foreman thereupon applied to this court to direct the witness to answer the foregoing questions. Following a hearing at which the witness was represented by counsel, this court ruled that the questions were proper in every respect and directed the witness to return to the Grand Jury room and to answer each of the questions.
On April 27, 1956, the witness reappeared before the Grand Jury, each of the questions was again read to him, and he persisted in his refusal to answer each of those questions on the same stated ground of possible self incrimination.
Thereupon, on April 30, 1956, the present application was made to this court for an order adjudging the witness, Milton Knapp, in contempt of court. A further hearing was held at which the witness was again represented by counsel. At this hearing, the witness raised the objection that the entire investigation by the Grand Jury was beyond its jurisdiction, the claim advanced being that the business in which the witness was engaged was an industry affecting interstate commerce, and that section 302 of the Federal Labor Management Relations Act of 1947, the so-called Taft-Hartley Act (U. S. Code, tit. 29, § 186), had completely pre-empted the subject matter of payments made by an employer to a representative of employees in any industry affecting interstate commerce, and thereby rendered inoperative any State legislation on the same subject matter. Section 380 of the Penal Law is entitled ‘ ‘ Bribery of Labor Representatives ” and makes it a misdemeanor for any duly appointed representative of a labor organization to solicit, accept or agree to accept a bribe from any person for the purpose of influencing his “acts, decisions, or other duties as such representative ” or for the purpose of inducing bim to refrain from causing or preventing “ a strike or work stoppage or any form of injury to any business ’ ’; and it also makes guilty of a misdemeanor any person who gives or offers a bribe to such a representative for any such purpose (see People v. Cilento, 1 A D 2d 206, 207-208).
*453 Section 302 of the Taft-Hartley Act (U. S. Code, tit. 29, § 186), on which respondent witness here relies, makes it a misdemeanor, subject to certain stated exceptions, for an employer ‘ to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce,” and likewise makes it a misdemeanor for any such representative ‘ ‘ to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.” The section has been interpreted by the United States Supreme Court as creating a criminal offense of the nature of malum prohibitum, and as outlawing “ all payments, with stated exceptions, between employer and representative ” (United States v. Ryan, 350 U. S. 299).
It has long been settled that “ the same act might, as to its character and tendencies, and the consequences it involved, constitute an offense against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each ” (California v. Zook, 336 U. S. 725, 731, quoting from United States v. Marigold, 9 How. [U. S.] 560, 569, and other case there cited).
The question, in essence, where the Federal Government has legislated on a subject within its jurisdiction and there is, also State legislation affecting the same subject, is whether Congress intended to make its jurisdiction exclusive, thereby displacing the State statutes. It is established that “ normally congressional purpose to displace local laws must be clearly manifested ” (California v. Zook, supra, p. 733, and cases there cited). And where the claim is that the State legislation conflicts with the Federal enactment, ‘ ‘ it must be clear that the Federal provisions are inconsistent with those of the state to justify the thwarting of state regulation ” (Cloverleaf Co. v. Patterson, 315 U. S. 148, 156).
One of the factors which has been given great weight in determining that Congressional action was not intended to override State legislation in the same area has been that the State laws, if that be the case, are aimed at evils within the scope of the State’s traditional police powers. Thus, in Fox v. Ohio (5 How. [U. S.] 410) it was held that the act of passing counterfeit money, though a crime under the Federal Criminal Code, could also be punished by the State as the perpetration of a fraud on the person to whom the spurious money was passed (see Pennsylvania v. Nelson, 350 U. S. 497, 500). And *454 in Gilbert v. Minnesota (254 U. 8. 325) a State enactment which proscribed interference with, or discouragement of, the enlistment of men in the military or naval service of the United States or of the State, was upheld as a valid “ local police measure,” notwithstanding existing Federal legislation on the same subject (see Pennsylvania v. Nelson, supra, p. 500).
It has similarly been observed that the punishment of such acts as extortion, fraud and violence, among others, is within the ambit of the State’s 1 ‘ usual police powers,” which will not be deemed displaced by regulatory Federal legislation in the field in which such acts are committed, in the absence of an express manifestation of such a Congressional purpose (see California v. Zook, supra, pp. 732, 734-735).
‘ ‘ It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States, even when it may do so, unless its purpose to effect that result is clearly manifested ” (Reid, v. Colorado, 187 U. S. 137, 148; see Kelly v. Washington, 302 U. S. 1, 11).
Extortion (Penal Law, § 850 et seq.) and bribery in connection with labor relations (Penal Law § 380) have long been the subject of regulation in this State. They are certainly within the ambit of the historic and traditional police power of the State. There is nothing in the language of the Federal statute here involved or in its legislative history to suggest that Congress intended to foreclose the States from continuing to protect their inhabitants from such evils. On the contrary, such sources of Congressional intent as are available indicate that Congress did not purpose to invalidate existing State legislation on such subjects or to preclude State action with regard thereto.
Respondent relies on a series of Supreme Court decisions in the field of labor relations which have held that the broad powers conferred upon the National Labor Relations Board by the Taft-Hartley Act for the regulation of unfair labor practices, operate to preclude the States from exercising jurisdiction over such practices, either in the administrative or in the judicial sphere, where the acts complained of do not reach the stage of violence or unlawful coercion (Garner v. Teamsters Union, 346 U. S. 485; Weber v. Anheuser-Busch, 348 U. S. 468; Mine Workers v. Arkansas Flooring Co., 351 U. S. 62). In Garner v. Teamsters Union (supra, p. 488) the Supreme Court, however, emphasized: “ The national Labor Management Relations Act, as we have before pointed out, leaves much to the states, though congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will *455 the area in which state action is still permissible. This is not an instance of injurious conduct which the National Relations Board is without express power to prevent and which therefore either is ‘ governable by the State or it is entirely ungoverned. ’ In such cases we have declined to find an implied exclusion of State powers International Union v. Wisconsin Board, 336 U. S. 245, 254. Nor is this a case of mass picketing, threatening of employees, obstructing streets and highways, or picketing homes. We have held that the State still may exercise ‘ its historic powers over such traditionally local matters as public safety and order and the use of streets and highways ’ AlleBradley Local v. Wisconsin Board, 315 U. S. 740, 749.” (Italics supplied.)
The Supreme Court has thus held, that applicable State remedies were not superseded by the jurisdiction reposed in the National Labor Relations Board, where the acts in question involved mass picketing, threats of violence and obstruction of public ways (Allen-Bradley Local v. Wisconsin Bd., supra), or constituted unlawful coercive tactics (Auto Workers v. Wisconsin Bd., 336 U. S. 245). In the latter case, the court declared (pp. 252-253): “ Congress has not seen fit in either of these Acts [the Taft-Hartley Act and the earlier Wagner Act] to declare either a general policy or to state specific rules as to their effects on State regulation of various phases of labor relations over which the several States traditionally have exercised control. * * * However, as to coercive tactics in labor controversies, we have said of the National Labor Relations Act what is equally true of the Labor Management Relations Act of 1947, that ‘ Congress designedly left open an area for State control ’ and that the ‘ intention of Congress to exclude States from exercising their police power must be clearly manifested. ’ Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U. S. 740, 750, 749.”
Similarly, in United Workers v. Laburnum Corp. (347 U. S. 656), it was held that the Taft-Hartley Act did not preclude the maintenance of a common-law tort action in a State court for damages based upon tortious conduct of certain labor organizations, involving threats of violence and intimidation, notwithstanding that such acts also constituted unfair labor practices as .defined by the Federal statute. In its opinion in that case, the court quoted from the Senate report (No. 105, 80th Cong., 1st Sess., 50) preceding the adoption of the Taft-Hartley Act, as indicative of the design of that act not to supersede State regulation where the acts to be regulated by the Federal act *456 were also “ illegal under State law ” (p.' 668). The court also quoted from a statement made by Senator Taft on the floor of the Senate that “ There is no reason in the world why there should not be two remedies for an act of that kind ’ ’ (pp. 668-669).
There is no claim or suggestion that the acts here under investigation by the Grand Jury constitute “ unfair labor practices ” subject to the exclusive jurisdiction of the National Labor Relations Board. Decisions such as Garner v. Teamster Union and Weber v. Anheuser-Busch (supra), are therefore inapplicable. Bather, the situation here presented is more closely analogous to the other cases noted above, in which the Supreme Court held that acts of violence, intimidation, disorder and tortious injury remain subject to State regulation for the safeguarding of local interests, notwithstanding the enactment of the Taft-Hartley Act.
Bespondent also cites the recent decision of the Supreme Court in Pennsylvania v. Nelson (350 U. S. 497, supra) where a Pennsylvania sedition statute was held to have been superseded by the Federal anti-sedition legislation. In reaching that conclusion, however, the court emphasized that the Federal legislation touched “ a field in which the federal interest is so dominant that the federal system [must] be assumed to preclude enforcement of state laws on the same subject ” (p. 504), and that the “ enforcement of State sedition acts presents a serious danger of conflict with the administration of the Federal program” (p. 505). The court further pointed out that sedition was ‘ ‘ not a local offense ’ ’ but rather ‘1 a crime against the Nation” (p. 505). It is significant that the court further noted the limits of its decision in the following words (p. 500): “ Neither does it limit the right of the State to protect itself at any time against sabotage or attemped violence of all kinds. Nor does it prevent the State from prosecuting where the same act constitutes both a Federal offense and a State offense under the police power ”.
In the present case there is no doubt that the crimes of bribery of labor representatives, extortion and conspiracy, which are the subject of the pending Grand Jury investigation, constitute local offenses within the reach of the State’s traditional police powers. The mere fact that section 302 of the Taft-Hartley Act (U. S. Code, tit. 29, § 186) in a measure parallels the State statute governing one of these crimes, i.e., that of bribery of labor representatives (Penal Law, § 380), does not operate to invalidate the State enactment (California v. Zook, 336 U. S. 725, *457 730, supra). The pertinent decisions make it clear that Congress will not be taken to have intended to debar the State from safeguarding its citikenry from pernicious evils of this kind. No conflict has been shown to exist, or is to be found, between the local statutes here involved and either the terms or the policy of the Federal legislation. There is consequently no basis for holding that the State is without jurisdiction of these offenses, or that the Grand Jury lacks the power to conduct an investigation in relation thereto.
As a further justification for his refusal to answer the questions asked by the Grand Jury, respondent urges the fact that he has not been granted immunity thereby from possible Federal prosecution.
In this connection, it need only be observed that the immunity granted respondent (Penal Law, § 2447), was the maximum which could be granted by this State (People v. Breslin, 306 N. Y. 294, cert, denied 347 U. S. 1014). Consequently, the requirement of both the State and Federal Constitutions has been satisfied (Brown v. Walker, 161 U. S. 591; Jack v. Kansas, 199 U. S. 372; Feldman v. United States, 322 U. S. 487, 493; People v. Breslin, supra; Dunham v. Ottinger, 243 N. Y. 423, 438; Matter of Herlands [Carchietta], 204 Misc. 373).
Respondent finally contends that this court may not punish him summarily, since the Grand Jury is not in the immediate view and presence thereof, and that the proceedings must be initiated by an order to show cause.
In answering this contention, we need not consider whether the original refusal to answer the questions put by the Grand Jury was a contempt committed in the constructive presence of this court, since this court heard sworn testimony by the Grand Jury stenographer both as to this original refusal and as to the subsequent refusal after a specific direction by this court. Furthermore, respondent, in open court, has stated his refusal to answer the questions, thereby reaffirming the position taken before the Grand Jury. Under the circumstances, respondent’s contempt was committed in the view and presence of this court (People ex rel. Hackley v. Kelly, 24 N. Y. 74). No further proof is necessary (Matter of Douglas v. Adel, 269 N. Y. 144, 146-147).
Even were it otherwise, it would be an idle gesture to serve respondent with an order to show cause. Respondent has been fully advised of the specifications upon which this application is based and has been represented by counsel at all stages of the proceedings herein. Respondent and counsel have appeared *458 in this proceeding on five different days, over the period of a month. There have been hearings, at which respondent vigorously urged defenses of law, and made no attempt to controvert any of the material facts herein. Briefs have been submitted by both parties. Consequently, the statutory requirements (Judiciary Law, § 751) applicable to criminal contempts not committed in the view and presence of the court have been satisfied (Matter of Spector v. Allen, 281 N. Y. 251).
It is therefore my conclusion that respondent witness was not justified in refusing to answer the questions put to him, and that the application to punish him for contempt must be granted.
I sentence the defendant to the term of 30 days in civil prison and fine him the sum of $250.