# KNAPP *v.* SCHWEITZER, JUDGE OF THE COURT OF GENERAL SESSIONS, ET AL.

No. 189.   Argued March 6, 10, 1958.—Decided June 30, 1958.

*Bernard H. Fitzpatrick* argued the cause for petitioner. With him on the brief was *William J. Keating.*

*Richard G. Denzer* argued the cause for respondents. With him on the brief were *Frank S. Hogan, Charles W. Manning, H. Richard Uviller* and *Harold Birns.*

Mr. Justice Frankfurter delivered the opinion of the Court.

Petitioner is a partner in a New York manufacturing firm engaged in interstate commerce, some of whose employees have been organized by a local union of the International Brotherhood of Teamsters. Petitioner was subpoenaed to appear before a New York grand jury conducting an inquiry regarding bribery of labor representatives, conspiracy and extortion, constituting crimes under state law. Petitioner, duly sworn, was asked a question concerning the union's representation in certain wage negotiations with petitioner's firm; he refused to answer on the ground that his answer might tend to incriminate him. The grand jury then granted petitioner immunity from prosecution, applying N. Y. Penal Law, §§ 381, 2447, which provides that one duly granted immunity

> "shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order by competent authority, he gave answer or produced evidence, and that no such answer given or evidence produced shall be received against him upon any criminal proceeding." § 2447 (2).

Having been thus granted immunity, petitioner was directed to answer the question. He again refused to do so on the ground of possible self-incrimination.

In a subsequent appearance before the grand jury, petitioner was asked, and was directed to answer by the foreman, fourteen other questions concerning relations

and transactions between petitioner and union officials. Petitioner again invoked the privilege against self-incrimination. On application of the foreman of the grand jury, respondent Schweitzer, as judge of a New York Court of General Sessions, ordered petitioner to return to the grand jury and make answer to the questions put to him.

After further refusal to answer, petitioner was once more ordered to appear before respondent Schweitzer; when he did so, the respondent district attorney moved that petitioner be punished for contempt of court. In opposition to this application petitioner stood on his refusal to answer inasmuch as the immunity granted by the grand jury did not protect him against federal prosecution. Respondent Schweitzer adjudged petitioner in contempt of court and sentenced him to serve thirty days in jail and to pay a fine of $250. 4 Misc. 2d 449, 157 N. Y. S. 2d 820.

Petitioner applied to the Supreme Court of New York for reversal of the contempt conviction and for an order prohibiting respondents from proceeding further in the matter. He alleged that his danger of self-incrimination was attributable to the prosecutorial potentialities of § 302 of the Labor Management Relations Act of 1947, 61 Stat. 136, 157, 29 U. S. C. § 186, making it unlawful

> "for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce" (§ 302 (a)),

and to the fact that the United States Attorney for the Southern District of New York had "made public announcement of his intention to cooperate with the [respondent] District Attorney . . . in the prosecution of criminal cases in the field of the subject matter out of which petitioner's commitment arose." The petition for

reversal of the contempt conviction was denied by the Supreme Court; this judgment was unanimously affirmed in the Appellate Division, 2 App. Div. 2d 579, 157 N. Y. S. 2d 158, and, without opinion, by the Court of Appeals of New York, 2 N. Y. 2d 913, 141 N. E. 2d 825, which duly amended its remittitur to show that it had passed on and rejected petitioner's claim of a privilege against self-incrimination under the Fifth Amendment, 2 N. Y. 2d 975, 142 N. E. 2d 649. We granted certiorari, 355 U. S. 804, to consider this constitutional question.

Petitioner does not claim that his conviction of contempt for refusal to answer questions put to him in a state proceeding deprived him of liberty or property without due process of law in violation of the Fourteenth Amendment; that such a claim is without merit was settled in *Twining* v. *New Jersey*, 211 U. S. 78. His contention is, rather, that, because the Congress of the United States has in the exercise of its constitutional powers made certain conduct unlawful, the Fifth Amendment gives him the privilege, which he can assert against either a State or the National Government, against giving testimony that might tend to implicate him in a violation of the federal Act.[1] Because of the momentum of adjudication whereby doctrine expands from case to case, such a claim carries dangerous implications. It may well lead to the contention that when Congress enacts a statute carrying criminal sanctions it has as a practical matter withdrawn from the States their traditional power to investigate in aid of prosecuting conventional state

---

[1] No force or validity is added to petitioner's argument by the invocation of the Supremacy Clause, Art. VI, cl. 2, and the Privileges and Immunities Clause of the Fourteenth Amendment. Whatever the applicability of the Fifth Amendment, it is in no way expanded by those two provisions. Cf. *Twining* v. *New Jersey, supra,* at 99: "[T]he exemption from compulsory self-incrimination is not a privilege or immunity of National citizenship . . . ."

crimes, some facts of which may be entangled in a federal offense. To recognize such a claim would disregard the historic distribution of power as between Nation and States in our federal system.

The essence of a constitutionally formulated federalism is the division of political and legal powers between two systems of government constituting a single Nation. The crucial difference between federalisms is in a wide sweep of powers conferred upon the central government with a reservation of specific powers to the constituent units as against a particularization of powers granted to the federal government with the vast range of governmental powers left to the constituent units. The difference is strikingly illustrated by the British North America Act, 1867, 30 Vict., c. 3, and the Commonwealth of Australia Constitution Act, 1900, 63 & 64 Vict., c. 12. It is relevant to remind that our Constitution is one of particular powers given to the National Government with the powers not so delegated reserved to the States or, in the case of limitations upon both governments, to the people. Except insofar as penal remedies may be provided by Congress under the explicit authority to "make all Laws which shall be necessary and proper for carrying into Execution" the other powers granted by Art. I, § 8, the bulk of authority to legislate on what may be compendiously described as criminal justice, which in other nations belongs to the central government, is under our system the responsibility of the individual States.

The choice of this form of federal arrangement was the product of a jealous concern lest federal power encroach upon the proper domain of the States and upon the rights of the people. It was the same jealous concern that led to the restrictions on the National Government expressed by the first ten amendments, colloquially known as the Bill of Rights. These provisions are deeply concerned with procedural safeguards pertaining to crim-

inal justice within the restricted area of federal jurisdiction. They are not restrictions upon the vast domain of the criminal law that belongs exclusively to the States.[2] Needless to say, no statesman of his day cared more for safeguarding the liberties that were enshrined in the Bill of Rights than did James Madison. But it was his view that these liberties were already protected against federal action by the Constitution itself. "My own opinion," he wrote to Thomas Jefferson, "has always been in favor of a bill of rights; provided it be so framed as not to imply powers not meant to be included in the enumeration. At the same time I have never thought the omission a material defect, nor been anxious to supply it even by subsequent amendment, for any other reason than that it is anxiously desired by others. I have favored it because I supposed it might be of use, and if properly

---

[2] In 1833 Mr. Chief Justice Marshall had this to say:

"Had the framers of these amendments intended them to be limitations on the powers of the state governments, they would have imitated the framers of the original constitution, and have expressed that intention. Had congress engaged in the extraordinary occupation of improving the constitutions of the several states by affording the people additional protection from the exercise of power by their own governments in matters which concerned themselves alone, they would have declared this purpose in plain and intelligible language.

"But it is universally understood, it is a part of the history of the day, that the great revolution which established the constitution of the United States, was not effected without immense opposition. Serious fears were extensively entertained that those powers which the patriot statesmen, who then watched over the interests of our country, deemed essential to union, and to the attainment of those invaluable objects for which union was sought, might be exercised in a manner dangerous to liberty. In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the apprehended encroachments of the general government—not against those of the local governments." *Barron* v. *Baltimore*, 7 Pet. 243, 250.

executed could not be of disservice. I have not viewed it in an important light 1. Because I conceive that in a certain degree, though not in the extent argued by Mr. Wilson, the rights in question are reserved by the manner in which the federal powers are granted. . . ." [3] Plainly enough the limitations arising from the manner in which the federal powers were granted were limitations on the Federal Government, not on the States. The Bill of Rights that Madison sponsored because others anxiously desired that these limitations be made explicit patently was likewise limited to the Federal Government. If conclusive proof of this were needed, it is afforded by the fact that when Madison came to sponsor the Bill of. Rights in the House of Representatives as safeguards against the Federal Government he proposed that like safeguards against the States be placed in the United States Constitution.[4] Congress; however, rejected such limitations upon state power.

---

[3] Letter to Thomas Jefferson, Oct. 17, 1788, 14 Papers of Thomas Jefferson (Boyd ed. 1958) 16, 18. Madison went on to give the following additional reasons for his view: "2. Because there is great reason to fear that a positive declaration of some of the most essential rights could not be obtained in the requisite latitude. I am sure that the rights of conscience in particular, if submitted to public definition would be narrowed much more than they are likely ever to be by an assumed power. . . . 3. Because the limited powers of the federal Government and the jealousy of the subordinate Governments, afford a security which has not existed in the case of the State Governments, and exists in no other. 4. Because experience proves the inefficacy of a bill of rights on those occasions when its controul is most needed." 14 id., at 18–19. The entire, rather long, letter merits reading. For an account of Madison's management of the resolution that became the Bill of Rights, see Brant, James Madison: Father of the Constitution, 1787–1800, c. 21.

[4] "Mr. MADISON conceived this to be the most valuable amendment in the whole list. If there were any reason to restrain the Government of the United States from infringing upon these essential rights, it was equally necessary that they should be secured

While the adoption of the Fourteenth Amendment in 1868 did not change the distribution of powers between the States and the Federal Government so as to withdraw the basic interests of criminal justice from the exclusive control of the States, it did impose restrictions upon the States in the making and in the enforcement of the criminal laws. It did this insofar as the "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," *Hebert* v. *Louisiana,* 272 U. S. 312, 316; *Palko* v. *Connecticut,* 302 U. S. 319; *Malinski* v. *New York,* 324 U. S. 401, 412–416, with 438, are implied in the comprehensive concept of due process of law. But this concept does not blur the great division of powers between the Federal Government and the individual States in the enforcement of the criminal law.

Generalities though these observations be, they bear decisively on the issue that has been tendered in this case. To yield to the contention of the petitioner would not only disregard the uniform course of decision by this Court for over a hundred years in recognizing the legal autonomy of state and federal governments.[5] In these

against the State Governments. He thought that if they provided against the one, it was as necessary to provide against the other, and was satisfied that it would be equally grateful to the people." 1 Annals of Cong. 755 (1789).

[5] By 1900 the applicability of the Bill of Rights to the States had been rejected in cases involving claims based on virtually every provision in the first eight Articles of Amendment. See, *e. g., Article I: Permoli* v. *Municipality No. 1,* 3 How. 589, 609 (free exercise of religion); *United States* v. *Cruikshank,* 92 U. S. 542, 552 (right to assemble and petition the Government); *Article II: United States* v. *Cruikshank, supra,* at 553 (right to keep and bear arms); *Article IV: Smith* v. *Maryland,* 18 How. 71, 76 (no warrant except on probable cause); *Spies* v. *Illinois,* 123 U. S. 131, 166 (security against unreasonable searches and seizures); *Article V: Barron* v. *Baltimore,* note 2, *supra,* at 247 (taking without just compensation); *Fox* v. *Ohio,* 5 How. 410, 434 (former jeopardy); *Twitchell* v. *Pennsylvania,* 7 Wall. 321, 325–327 (deprivation of life without due process of law);

days of the extensive sweep of such federal statutes as the income tax law and the criminal sanctions for their evasions, investigation under state law to discover corruption and misconduct, generally, in violation of state law could easily be thwarted if a State were deprived of its power to expose such wrongdoing with a view to remedial legislation or prosecution. While corruption and generally low standards in local government may not today be as endemic as Lord Bryce reported them to be in The American Commonwealth (1888), not even the most cheerful view of the improvements that have since taken place can afford justification for blunting the power of States to ferret out, and thereby guard against, such corruption by restrictions that would reverse our whole constitutional history. To achieve these essential ends of state government the States may find it necessary, as did New York, to require full disclosure in exchange for immunity from prosecution. This cannot be denied on the claim that such state law of immunity may expose the potential witness to prosecution under federal law. See *Jack* v. *Kansas,* 199 U. S. 372. Every witness before a state grand jury investigation would feel free to block those vitally important proceedings.

In construing the Fifth Amendment and its privilege against self-incrimination, one must keep in mind its

---

*Spies* v. *Illinois, supra,* at 166 (compulsory self-incrimination); *Eilenbecker* v. *Plymouth County,* 134 U. S. 31, 34–35 (presentment or indictment by grand jury); *Article VI: Twitchell* v. *Pennsylvania, supra,* at 325–327 (right to be informed of nature and cause of accusation); *Spies* v. *Illinois, supra,* at 166 (speedy and public trial by impartial jury); *In re Sawyer,* 124 U. S. 200, 219 (compulsory process); *Eilenbecker* v. *Plymouth County, supra,* at 34–35 (confrontation of witnesses); *Article VII: Livingston's Lessee* v. *Moore,* 7 Pet. 469, 551–552 (right of jury trial in civil cases); *Justices* v. *Murray,* 9 Wall. 274, 278 (re-examination of facts tried by jury); *Article VIII: Pervear* v. *Massachusetts,* 5 Wall. 475, 479–480 (excessive fines, cruel and unusual punishments).

essential quality as a restraint upon compulsion of testimony by the newly organized Federal Government at which the Bill of Rights was directed, and not as a general declaration of policy against compelling testimony. It is plain that the amendment can no more be thought of as restricting action by the States than as restricting the conduct of private citizens. The sole—although deeply valuable—purpose of the Fifth Amendment privilege against self-incrimination is the security of the individual against the exertion of the power of the Federal Government to compel incriminating testimony with a view to enabling that same Government to convict a man out of his own mouth.

Of course the Federal Government may not take advantage of this recognition of the States' autonomy in order to evade the Bill of Rights. If a federal officer should be a party to the compulsion of testimony by state agencies, the protection of the Fifth Amendment would come into play. Such testimony is barred in a federal prosecution, see *Byars* v. *United States,* 273 U. S. 28. Whether, in a case of such collaboration between state and federal officers, the defendant could successfully assert his privilege in the state proceeding, we need not now decide, for the record before us is barren of evidence that the State was used as an instrument of federal prosecution or investigation. Petitioner's assertion that a federal prosecuting attorney announced his intention of cooperating with state officials in the prosecution of cases in a general field of criminal law presents a situation devoid of legal significance as a joint state and federal endeavor.

This Court with all its shifting membership has repeatedly found occasion to say that whatever inconveniences and embarrassments may be involved, they are the price we pay for our federalism, for having our people amenable to—as well as served and protected by—two governments. If a person may, through immunized self-

disclosure before a law-enforcing agency of the State, facilitate to some extent his amenability to federal process, or *vice versa,* this too is a price to be paid for our federalism. Against it must be put what would be a greater price, that of sterilizing the power of both governments by not recognizing the autonomy of each within its proper sphere.

*Judgment affirmed.*

MR. JUSTICE BRENNAN, concurring.

I join the Court's opinion upon my understanding that the only question we decide is that a witness who is granted immunity by a State against state prosecution may be compelled to testify in a state proceeding and cannot successfully assert the privilege against self-incrimination under the Fifth Amendment.

I therefore do not believe that reconsideration of the holding in *Feldman* v. *United States,* 322 U. S. 487, is necessary or appropriate in this case. In view of the contrary suggestion in the dissent of MR. JUSTICE BLACK, I think it proper however to note that in joining the Court's opinion, I should not be understood as believing that our decision today forecloses reconsideration of the *Feldman* holding in a case requiring our decision of that question.

MR. CHIEF JUSTICE WARREN, dissenting.

There can be no doubt that the problem in this case is a problem of federalism. Competing considerations of the greatest significance are involved. But in resolving questions that touch upon the intricate and delicate mechanism of our federal system it is especially important to remember, as Mr. Justice Holmes observed, that "General propositions do not decide concrete cases." *Lochner* v. *New York,* 198 U. S. 45, 76. In this case the New York courts sustained petitioner's conviction on the under-

standing that in the circumstances of this case the testimony petitioner was compelled to give before the New York State grand jury could not, as a matter of federal law, be employed in a subsequent federal prosecution. On the other hand, it is implicit in the majority opinion in this Court that the petitioner does run the risk of a federal prosecution based on his own testimony under *Feldman* v. *United States,* 322 U. S. 487. If we are to have any profitable discussion of federalism based on the facts of this case, we should begin with agreement on the facts and the controlling principles. In any event, we should not affirm a New York conviction if in fact the state courts construed state law under a misconception of federal law. To do so does violence to the vital principle of federalism that a state court is the final arbiter of state law. See *May* v. *Anderson,* 345 U. S. 528, 534, 535. I therefore agree with MR. JUSTICE BLACK that this case should be remanded so that the New York Court of Appeals can reconsider state law in light of the majority's conclusion that the role of the federal prosecutor was not such as to prevent use of the state-compelled testimony against petitioner in a federal prosecution. At all events, the unsettling influence that *Feldman* has had upon the course of this litigation indicates that a satisfactory solution cannot be reached without a reconsideration of that decision.

MR. JUSTICE BLACK, whom MR. JUSTICE DOUGLAS joins, dissenting.

Petitioner refused to answer questions directed to him by a New York grand jury on the ground that his answers might tend to incriminate him under both state and federal law. He was then granted immunity from prosecution under state law and ordered to answer. When he

persisted in his refusal he was found guilty of contempt and sentenced to jail.  In reviewing his conviction the Appellate Division of the New York Supreme Court rejected the contention that it violated both State and Federal Constitutions to punish him for declining to give testimony which might have incriminated him under federal law.   2 App. Div. 2d 579, 157 N. Y. S. 2d 158.

Article I, § 6 of the New York Constitution, like the Fifth Amendment, provides that "No person . . . shall be compelled in any criminal case to be a witness against himself."   The Appellate Division ruled that this state provision had not been infringed, pointing out (1) that petitioner had been granted immunity from state prosecution and (2) his answers could not be used to convict him of a federal crime since the record showed that the federal district attorney had "cooperated" with state officers in the grand jury investigation.   The New York Court of Appeals affirmed without opinion.   2 N. Y. 2d 913, 141 N. E. 2d 825.

In affirming, this Court evidently takes the position, contrary to the Appellate Division, that whatever cooperation between federal and state officials is disclosed by this record it is not enough to bar use of petitioner's testimony in a federal prosecution.   In the light of this, it seems to me that the proper course would be to vacate the judgment of the New York Court of Appeals and remand so that the courts of that State might consider petitioner's claim of privilege under the New York Constitution free from the erroneous assumption that his testimony could not be used to convict him of a federal crime.   See *Standard Oil Co. of California* v. *Johnson,* 316 U. S. 481.   Cf. *Patterson* v. *Alabama,* 294 U. S. 600, 607; 28 U. S. C. § 2106.   Otherwise petitioner will go to jail when there is at least a chance that the New York courts would not have upheld his conviction had they

known, as they now do, that his state-compelled testimony could be used against him in the federal courts.[1]

I think it is also appropriate to say a few words here about *Feldman* v. *United States,* 322 U. S. 487, which was referred to by the Appellate Division. In that case a minority of this Court held, 4–3, that information extracted from a person by state authorities under threat of punishment could be used to convict him of a federal crime.[2] The passage of time has only strengthened my conviction that this result is thoroughly contrary to the guarantee of the Fifth Amendment that no person shall be compelled to be a witness against himself, at least in a federal prosecution. The untenability of the premises upon which the Court relied in *Feldman* has been clearly revealed in a series of penetrating law review articles by Professor J. A. C. Grant. Immunity from Compulsory Self-Incrimination in a Federal System of Government, 9 Temple L. Q. 57, 194; Federalism and Self-Incrimination, 4 U. C. L. A. Law Rev. 549, 5 *id.,* 1. *Feldman* places a witness who is called before a state agency and ordered to testify in a desperate position; he must either remain silent and risk state imprisonment for contempt or con-

---

[1] In Michigan, at least, the state constitution has been interpreted as preventing state officers from compelling disclosure of facts which might tend to incriminate the witness under federal law, even though he has been granted full immunity from state prosecution. *People* v. *DenUyl,* 318 Mich. 645, 29 N. W. 2d 284. Cf. *State ex rel. Doran* v. *Doran,* 215 La. 151, 39 So. 2d 894.

[2] Contrast *Bram* v. *United States,* 168 U. S. 532, where this Court ruled that an involuntary confession could not be used in a federal prosecution even though it was procured by officers of a foreign nation outside the United States. And see *Ashcraft* v. *Tennessee,* 322 U. S. 143, at 155, where we declared that "The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession." It seems to me that there was at least as much coercion in *Feldman* as in either of these cases.

fess himself into a federal penitentiary. See *Marcello* v. *United States,* 196 F. 2d 437. Indeed things have now reached the point, as the result of *United States* v. *Murdock,* 284 U. S. 141, *Feldman,* and the present case, where a person can be whipsawed into incriminating himself under both state and federal law even though there is a privilege against self-incrimination in the Constitution of each. Cf. *Irvine* v. *California,* 347 U. S. 128; *United States* v. *Kahriger,* 345 U. S. 22. I cannot agree that we must accept this intolerable state of affairs as a necessary part of our federal system of government.