**UNITED STATES of America**

v.

**Joseph BONANNO et al., Defendants.**

United States District Court
S. D. New York.
Oct. 7, 1959.

S. Hazard Gillesie, Jr., U. S. Atty., for the Southern District of New York, New York City, for the United States, by Milton R. Wessel, Special Asst. to the Atty. Gen., Marvin B. Segal, Asst. U. S. Atty., Washington, D. C.

Louis J. Lefkowitz, Atty. Gen., for the New York State Commission of Investigation, by Irving Galt, Asst. Sol. Gen. and Chief of Litigation Bureau, New York City, and Philip Weinberg, New York City, Atty., New York State Attorney General's Office.

Franken, Kramer, Bam & Nessen, New York City, for Paul C. Castellano and Carmine Lombardozzi, by Maurice N. Nessen, New York City, of counsel.

Harry H. Oshrin and Louis Susman, New York City, for Joseph Bonanno.

S. Thomas Bianco, Pittston, Pa., for James Osticco.

Edward H. Levine, New York City, for Joseph Magliocco.

Louis Mansdorf, New York City, for Anthony P. Riela.

Henry C. Lavine, Cleveland, Ohio, for John A. DeMarco.

David H. Markowitz, New York City, for Joseph F. Civello.

Fred H. Mandel, Cleveland, Ohio, for John Ormento.

Moses L. Kove, New York City, for Frank A. DeSimone and Simone Scozzari.

Maurice Edelbaum, New York City, for Natale Evola, Frank Cucchiara and Russell A. Bufalino.

George Feit, New York City, for John Ormento.

IRVING R. KAUFMAN, District Judge.

Of the great number of pre-trial motions submitted by the defendants in this case, only one group remains for decision; the others have been decided by my Opinion filed September 30, 1959, D.C., 177 F.Supp. 106. A full discussion of the allegations of the indictment in this case is contained in that Opinion. In the instant group of motions the defendants move jointly and/or individually for an order suppressing testimony elicited from certain defendants and co-conspirators not indicted under a grant of immunity by the New York State Commission of Investigation.[1] Briefly stated, the defendants' position is that mere cooperation in investigation of the defendants in this case between Federal and State authorities, renders testimony given under immunity to the latter inadmissible in a federal prosecution. The defendants also argue, but without much force, that testimony elicited under grant of immunity in a state proceeding can never be used in a subsequent federal prosecution, even if no cooperation between the state and federal governments is shown.

The general problem presented by these motions has been before the Supreme Court several times. Each time the Court has decided contrary to the sweeping position taken here by the movants. See Feldman v. United States,

---

1. Defendants Castellano, Lombardozzi, Miranda and Profaci and co-conspirators Riccobono, C. P. Valenti and F. Valenti are mentioned in the motion papers. Several other alleged co-conspirators also testified under immunity and this Opinion will apply to their testimony, so as to avoid any duplication of effort, if any similar question arises over such testimony.

1944, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408; Knapp v. Schweitzer, 1958, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393; Mills v. State of Louisiana, 1959, 360 U.S. 230, 79 S.Ct. 980, 3 L.Ed.2d 1193. I believe it is in order to discuss those decisions and their language with particularity, so that the state of the law in this area may be established with clarity.

In Feldman v. United States, supra, an individual appearing in Supplementary Proceedings in a State court action disclosed, under a grant of immunity from state prosecution, practices amounting to check "kiting". He was subsequently convicted by the federal government of mail fraud involving the "kiting", his earlier testimony in the state proceeding having been admitted against him. The Supreme Court upheld the conviction. Mr. Justice Frankfurter, writing for the majority, stated:

"The Government here is not seeking to benefit by evidence which it *extorted*. It had no power either to compel testimony in the state court or to forestall such disclosure as a means of avoiding possible interference with the enforcement of the federal penal code. * * * If a federal agency were to use a state court *as an instrument for compelling disclosures for federal purposes*, the doctrine of * * * McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, afford[s] adequate resources against such an evasive disregard of the privilege against self-crimination." 322 U.S. at page 492–494, 64 S.Ct. at page 1084 (emphasis supplied).

It is quite clear that the thrust of this dictum is toward finding evidence inadmissible only if elicited by federal activity which procured the immunity as a fraud on the defendant.

This reading of the majority's position in the Feldman case is fortified by a consideration of Knapp v. Schweitzer, supra. In that case the Supreme Court held that a person has no right to refuse to testify in a state proceeding after being granted immunity from state prosecution, merely because his testimony might be used in a subsequent federal prosecution. The record on appeal to the Supreme Court contained some evidence of federal-state cooperation in investigation, and the Court was well aware of the dangers involved.

"Of course the Federal Government may not take advantage of this recognition of the States' autonomy in order to evade the Bill of Rights. If a federal officer should be *a party to the compulsion* of testimony by state agencies, the protection of the Fifth Amendment would come into play * * * the record before us is barren of evidence *that the State was used* as an instrument of federal prosecution or investigation. Petitioner's assertion that a federal prosecuting attorney announced his intention of cooperating with state officials in the prosecution of cases in a general field of criminal law presents a situation devoid of legal significance as a joint state and federal endeavor. * * * If a person may, through immunized self-disclosure before a law enforcing agency of the State, facilitate to some extent his amenability to federal process, or vice versa, this too is a price to be paid for our federalism." 357 U.S. at pages 380–381, 78 S.Ct. at page 1308 (emphasis supplied).

Thus it is clear that there is no violation of the privilege against self-incrimination unless the government is "a party to the compulsion" or the state is "an instrument" of the federal government.[2]

---

**2.** The last sentence of the excerpt from Knapp v. Schweitzer, supra, also makes clear that in ruling that a witness could not refuse to answer, the Court recognized that it was also ruling that his testimony could be used against him in a subsequent federal prosecution. But cf. Mills v. State of Louisiana, supra, 360 U.S. at pages 230–231, 79 S.Ct. 980; Knapp v. Schweitzer, supra, 357 U.S. at

Finally, in Mills v. State of Louisiana, the Supreme Court affirmed the contempt citation of a person who refused to testify before a state agency even after having been granted immunity from state prosecution. It is significant that the record on appeal contained the following stipulation of federal-state cooperation.

"That there has existed, and now exists [at the time of the State proceeding], cooperation and collaboration between the District Attorney for the Parish of Orleans and the United States Attorney for the Eastern District of Louisiana and the Internal Revenue Service of the United States of America and its investigators, as well as with the Police Bureau of Investigation of the City of New Orleans in reference to members of the New Orleans Police Department regarding public bribery and income tax evasion and that the Honorable Leon D. Hubert, Jr., District Attorney for the Parish of Orleans, has held conferences with the United States Attorney for the Eastern District of Louisiana regarding public bribery on the part of certain members of the New Orleans Police Department and income tax evasion, felonies under the law of the United States of America and the State of Louisiana." 360 U.S. at page 232, 79 S.Ct. at page 981 (dissenting opinion).

In the face of this stipulation, which disclosed close cooperation between state and federal authorities in the investigation and prosecution of activities illegal in both jurisdictions, the Supreme Court found that the federal government was not a "party to the compulsion" of the immunized testimony nor that the state was an "instrument" of the federal government. Thus, it is clear, that the correct disposition of the instant motions is denial unless the record in this case discloses that the relationship between the state and federal governments was closer than that disclosed in Mills, and amounted to an actual or tacit procurement of the grant of immunity for purposes of federal prosecution.

█ While the affidavits of defendants' attorneys, filed with these motions, disclosed no evidence of any such federal-state relationship as would overstep the bounds set by the Supreme Court,[3] I ordered a hearing nevertheless, in order to give the defendants every opportunity to probe this important question. I recognized that proof of an impermissible federal-state relationship would be difficult to show unless the official involved could be examined with some degree of latitude. Thus, while the hearing was limited to the question of procurement, I allowed counsel for the defendants broad scope in their examination of witnesses. They were permitted to elicit information as to the amount and nature of cooperation between the state and federal agents involved, first, in order to attack the credibility of those witnesses who testified directly that no procurement took place and second, in order to establish such a pattern of state-federal cooperation, if it existed, as would establish a tacit, and perhaps unconscious, procurement of the grants of immunity. It is now crystal clear after hearing the witnesses, that, beyond any shadow of doubt, no express or tacit procurement of the grants of immunity took place.

Mr. Wessel, the Special Assistant to the Attorney General in complete charge

---

page 381, 78 S.Ct. 1302 (concurring opinions).

**3.** All that was really alleged in the affidavits is that the federal agents were quickly aware of the progress of the Commission of Investigation and that "two young men, dressed conservatively, in the mode fashionable among Ivy League undergraduates and alumni [were] in the [Commission of Investigation] hearing room busily taking notes." Joint Motion to Suppress Testimony, affidavit p. 5. As for the last matter, Mr. Segal specifically denied that the mysterious young men belonged to the prosecution staff, mode of dress notwithstanding. See Transcript p. 439. (Hereafter citations to the transcript will be in the form "Tr. 439").

of the investigation and trial of this case; Mr. Segal, his chief assistant; Mr. Ryan, the Chairman of the New York State Commission of Investigation; Mr. Lumbard, that Commission's Chief Counsel and Mr. Milenky, the Commission's Chief Investigator, all testified unequivocally, that the federal government had not procured or sought to procure any grant of immunity for any defendant or co-conspirator for any purpose.[4] Indeed, these witnesses testified that Mr. Wessel and his staff, aware of the ambiguity of some of the language in Knapp v. Schweitzer (Mills v. State of Louisiana not then having been decided) sought to prevent the Commission from granting any immunity.[5] Unless I am prepared to hold that each and every one of these witnesses perjured himself, which I am convinced is not the case, I cannot find that any express procurement of the immunity grants took place. Nor, is it possible that an express procurement took place without the knowledge of these witnesses. Mr. Wessel was in complete charge of the case almost from its inception. More important, no immunity could be granted without Mr. Ryan's knowledge, for only the commissioners and not the staff were empowered to grant the immunity, and he testified unequivocally that the immunity grants were made for state purposes over federal objection.[6]

Furthermore, the defendants did not show anything which would lead me to the conclusion that a pattern of cooperation amounting to tacit or unconscious procurement existed here. The existence of such an inferential procurement cannot withstand the onslaught of the uncontested testimony that the government opposed the grants and the state authorities granted them for state purposes alone.[7] In the face of this forceful adverse evidence the defendants suggested that if cooperation or inducement between state and federal authorities existed before the present witnesses entered the investigation, it should cause me to find that the present Commission

---

4. "The Witness: [Mr. Wessel] * * * I would like to categorically answer the question posed by this proceeding and state that no action of any kind whatsoever by the Federal Government was calculated to, or, in fact, did, induce the State Commission of Investigation to extend immunity for the purpose of soliciting or obtaining information for the benefit of the Federal Government, and that, moreover, the Federal Government has taken every step within its power to avoid that consequence." (Tr. 220–221).

"The Witness: [Mr. Ryan] The Federal Government had nothing to do with our granting immunity. We granted immunity only for our own purposes. We wanted the information which we might get by granting immunity. But we wanted it for our purposes and our purposes only, Judge." (Tr. 340).

"The Court: * * * First, I want to ask you whether there was any conduct on the part of any Government official which from your knowledge caused the New York State Commission of Investigation to grant immunity to any of the people involved in the indictment in this case?

"The Witness: [Mr. Lumbard] There was no such conduct to my knowledge. * * *

"The Court: * * * And did Mr. Wessel take the position that he did not favor a grant of immunity?

"The Witness: He certainly did." (Tr. 368)

"The Court: * * * I ask you whether from your own knowlege you know whether any action on the part of the Federal Government, either through you directly or to the Commissioners or to anybody else, caused the State Investigation Commission to grant immunity to any of the people * * *

"The Witness: [Mr. Milenky] To my knowledge, Judge, absolutely not." (Tr. 425).

"Mr. Wessel: * * * You heard the testimony * * * as to the alleged inducement of immunity or lack of it, and specifically my own testimony * * *. Is there anything about my testimony which was not true, to your own knowledge?

"[Mr. Segal]: No, there was absolutely [nothing] about your testimony which is not true." (Tr. 438–439).

5. See Tr. 223–225, 233–236 [Mr. Wessel]; Tr. 386–87 [Mr. Lumbard]; Government Exhibits 73 & 74; Defendants' Exhibit A.

6. Tr. 344 [Mr. Ryan].

7. See note [4], supra.

of Investigation "adopted" those negotiations and granted immunity pursuant to them. But the adoption was denied,[8] and the mere allegations of ancient "inducement" or "cooperation" were unproved.[9] In fact, if I were to compare the defendants' evidence of cooperation with the stipulation in the Mills case, the case for the defendant in Mills would be far more convincing. It should be noted furthermore, that there is evidence of considerable care used by both the state and federal authorities to prevent accidental procurement or use of tainted evidence from each other.[10]

I am led to the conclusion, in the light of the testimony negating procurement, that the defendants were not really attempting to show any procurement of the grants of immunity, either express or tacit, but rather were seeking to present evidence of cooperation between law-enforcement agencies in the hope of establishing new law in this area. That being so, it is their position, I assume, that any cooperation between state and federal authorities in the investigation of the same persons, absent procurement by the federal government of the grant of immunity, will render statements given to the state under a grant of immunity inadmissible in a subsequent federal prosecution.[11] I must, therefore, deal with this theory.

Initially, it should be stated that it is unsupported even by dictum in the three leading Supreme Court decisions in this area. The movants' position seems to me to stem from a failure to distinguish between factors that might taint evidence obtained under a grant of immunity and factors that lead to other kinds of taint. I suggest that it is not sufficiently appreciated that the illegality involved in the area covered by the instant motions is in the procurement of the grant of immunity and not merely in the procurement of the evidence itself. Certainly, no one would contend that a state has no power to grant immunity to a person in order to obtain his testimony for the state's purposes. Furthermore, it is clear that while Feldman v. United States remains the law of the land, there is no illegality involved in federal use of statements elicited by states under a grant of state immunity. Thus, it follows that the fact that such testimony was made available to federal authorities is without legal significance except as evidence of the movants' position that the original testimony was procured by the federal government, in effect as a fraud upon the defendant and upon the Bill of Rights. But, that is not the case here. Moreover, it is noted that all material elicited under a grant of immunity was a matter of public record once procured.[12]

The situation is quite different in other areas where tainted evidence may be involved. In the McNabb area, for instance, the Supreme Court has, in effect, chosen to regulate the workings of its system of criminal justice by conclusively presuming that evidence procured during an unreasonably long delay before arraignment is coerced. The operative fact, the presumed coercion, has nothing to do with federal involvement. In such a case the government will not be allowed to *use* presumptively coerced evidence. See United States v. Coppola, 2 Cir., —— F.2d ——. Similarly, the government may not use evidence procured under an invalid state search warrant. In those areas the illegality occurs prior to federal involvement. But, in the instant case, the illegality, if any, stems

---

8. Tr. 401 [Mr. Lumbard].

9. Mr. Reuter, who investigated the Apalachin gathering for New York State before the creation of the Commission of Investigation, was present at the hearing but left without testifying. See Tr. 332-333, 335.

10. See Tr. 423–24, 429 [Mr. Milenky].

11. See, e. g. Tr. 257, 290–91, 413–414.

12. While the Government used the State files to a limited extent, it had no access to the files dealing with closed sessions. See Tr. 316.

·*from* the federal involvement, and in default of a showing that federal activity focused on the grant of immunity was present (which evidence is entirely lacking in this case) the evidence is admissible.

██ This is not a mere exercise in legalistic hairsplitting. I am completely in accord with the maxim that evidence procured, by state or federal officials, in derogation of the constitutional rights of citizens of this country, ought not be allowed to be used in this nation's courts. Evidence presumptively coerced, evidence seized under invalid warrants, should be suppressed, and no considerations of federalism ought to be allowed to stand in the way of that constitutional protection. The same may be said for ·evidence procured by defrauding a person into thinking the sovereign granting him immunity is acting for its own purposes, when in fact it is acting as an agent for another which has granted no immunity and·is, therefore, forcing him to abandon his rights under the Fifth Amendment. But, I do not subscribe to the position that evidence lawful when obtained ought be struck as tainted merely because another sovereign seeks to use it. Certainly, cooperation, ipso facto, between law-enforcement agen-

cies, state and federal, is not per se a derogation of constitutional rights. Indeed, such cooperation is desirable and necessary particularly in these days of mounting crime statistics. To place each law enforcement official in his own vacuum, be it either state or federal, and decree that neither could seek the assistance of the other under any circumstances, would be to sterilize law enforcement to such a degree that apprehension and prosecution of the accused would become an impossible task. Mr. Justice Brennan recognized this when he stated:

" * * * cooperation between federal and state authorities in criminal law enforcement is to be desired and encouraged, for cooperative federalism in this field can indeed profit the Nation and the States in improving methods for carrying out the endless fight against crime." Bartkus v. People of State of Illinois, 1959, 359 U.S. 121, 166, 79 S.Ct. 676, 705, 3 L.Ed. 2d 684 (dissenting opinion).

██ The record in this case does not disclose any activity calling for a rule which sounds the death knell for all federal-state law enforcement cooperation.[13]

The motions are denied. So ordered.

13. It should also be noted, in order to put this aspect of the prosecution into correct perspective, how narrow the scope of these motions is, in terms of evidence actually involved. The government does not intend to put to the jury any statement made by any defendant under a grant of immunity. It does intend to use several of such statements made by unindicted co-conspirators, but even if such testimony were tainted by federal procurement of the state grants of immunity, the defendants have no standing to complain. Fifth Amendment rights are personal. The co-conspirators were promised state immunity and received it. Thus far they have effectively received federal immunity, and have not been legally harmed by their testimony. They may have harmed their alleged co-conspirators now under federal indictment, but no person has any privilege to refuse to give testimony incriminating others. See 8 Wigmore, Evidence, sec. 2259 (3d ed. 1940). Therefore, the only evidence really involved in these motions is possible "fruit of the poisonous tree." See Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 268, 84 L.Ed. 307. It is worth noting that the Government has denied getting any information from the testimony given under immunity that it did not have from independent sources. See Tr. 270 [Mr. Wessel]. And nothing to the contrary has been shown.