IN THE MATTER OF THE APPLICATION OF THE WATER-
FRONT COMMISSION OF NEW YORK HARBOR, TO PUN-
ISH JOHN MOODY, Sr. FOR FAILURE TO OBEY A SUB-
POENA.

IN THE MATTER OF THE APPLICATION OF THE WATER-
FRONT COMMISSION OF NEW YORK HARBOR, TO PUN-
ISH WILLIAM MURPHY FOR FAILURE TO OBEY A
SUBPOENA.

Argued January 7, 1963—Decided March 4, 1963.

*Mr. Harold Krieger* argued the cause for the defendants-appellants, John Moody, Sr. and William Murphy (*Messrs. Krieger & Chodash*, attorneys; *Mr. Robert Wall*, of counsel, and *Mr. Harold Krieger* on the brief).

*Mr. Robert A. Pin* and *Mr. Irving Malchman* argued the cause for the Waterfront Commission of New York Harbor (*Mr. William P. Sirignano* and *Mr. Irving Malchman* (both of the New York Bar) on the brief).

The opinion of the court was delivered by

PROCTOR, J. This is a consolidated appeal from two judgments of the Superior Court, Law Division, adjudging each of the defendants, John Moody, Sr., and William Murphy, guilty of civil and criminal contempt for failing to testify pursuant to subpoenas issued by the Waterfront Commission of New York Harbor (Commission). The judgments fined the defendants $50.00 each and sentenced them to 30 days in jail. The judgments further ordered that the subpoenas be

obeyed by the giving of responsive answers before the Commission to the questions set forth therein, and that the defendants be incarcerated until they answer those questions. The judgments also provided for a stay of execution pending appeal, the defendants having previously posted bonds.

We certified the defendants' appeal before argument in the Appellate Division.

This is the second time that the defendants have been adjudged in civil contempt for their refusal to testify pursuant to the afore-mentioned subpoenas. Briefly, the history of this litigation is as follows: One James H. Markley was an investigator for the Commission, assigned principally to cover the piers of the American Export Lines in Hoboken, New Jersey. On or before May 16, 1960, Markley left the employ of the Commission in order to work for the American Export Lines as a security officer, and obtained a license from the Commission to operate as a port watchman. On Monday, May 16, 1960, the day Markley commenced work for the American Export Lines on its Hoboken piers, the longshoremen employed by American Export Lines on those piers did not report for work. This work stoppage, except for the morning of Tuesday, May 17, continued through Friday, May 20, 1960. The striking employees were members of Hoboken Local No. 2 of the International Longshoremen's Association (ILA). The defendant Moody is an organizer of the ILA in New Jersey, and the defendant Murphy is the business agent of Local No. 2.

Under our Waterfront Commission Act, *N. J. S. A.* 32:23-1 *et seq.* (the New York counterpart is *New York Laws* 1953, *c.* 882, *c.* 883 McK. Unconsol. Laws, § 9801 *et seq.*), the longshoremen who participated in this work stoppage are required to be and are registered with the Commission. *N. J. S. A.* 32:23-27. Also, under the act, Markley, as a security officer of American Export Lines is required to be licensed as a port watchman. *N. J. S. A.* 32:23-39.

The Commission had information that the work stoppage was "a concerted effort to keep James H. Markley off the

piers of the American Export Lines." Accordingly, the Commission instituted an investigation to determine whether any persons registered with or licensed by the Commission were violating the Waterfront Commission Act by coercing an employer to limit the functions of, or to discharge, a licensed port watchman. In connection with its investigation, the Commission duly served the defendants with subpoenas on May 18, 1960, ordering them to appear and testify at the Commission's offices in New York City. The defendants appeared at the offices of the Commission in response to the subpoenas on May 19, 1960. At the hearing, Moody, after giving his name and address and testifying that he was a union official, refused to answer any further questions. Murphy testified that he was business agent of Local No. 2 and represented members of the local working at the Hoboken piers of the American Export Lines. He said he knew that the longshoremen did not work on May 16, 1960, and that it was common knowledge that for some time before that day things were not normal at the American Export Lines. However, he refused to say whether those conditions were related to the employment of Markley as a port watchman, and he refused to answer any other questions. Both defendants expressly declined to assert their privilege against self-incrimination, although they were specifically asked if that was one of the grounds for their refusal to testify. The primary reason for their refusal to testify was their assertion that the Commission had no statutory authority to investigate the work stoppage because it involved a labor dispute over which the National Labor Relations Board had exclusive jurisdiction.[1]

Thereafter, the Commission instituted contempt proceedings against the defendants in the Superior Court, Law Division, which resulted in judgments dated June 20, 1960, hold-

[1] On defendants' appeal from the first judgment holding them in contempt (*In re Application of Waterfront Comm. of N. Y. Harbor*, 35 *N. J.* 62 (1961)), defendants' other stated reasons for their refusal to answer were not urged as a ground for reversal.

ing the defendants guilty of civil contempt and ordering that they be fined $50.00 each and that they be incarcerated until they obeyed the Commission's subpoenas. These judgments were affirmed by this court, and the United States Supreme Court dismissed the defendants' further appeal and also denied *certiorari*. *In re Application of Waterfront Comm. of N. Y. Harbor*, 35 *N. J.* 62 (1961), appeal dism'd and cert. den. *sub nom. Murphy v. Waterfront Commission of New York Harbor*, 368 *U. S.* 32, 82 *S. Ct.* 146, 7 *L. Ed. 2d* 91 (1961).

Pursuant to the mandate of this court in the above contempt proceedings, the defendants appeared before the Superior Court, Law Division, on October 3, 1961. The court directed the defendants to appear before the Commission pursuant to the May 1960 subpoenas. Later that day, the defendants appeared at the offices of the Commission as directed. However, except to give their names, addresses and occupations, the defendants again refused to answer any questions, this time upon a number of new objections including the privilege against self-incrimination. All of the objections were overruled by the Commission except the assertion of the privilege against self-incrimination. The hearing was then adjourned and the subpoenas were continued until October 10, 1961, so that the Commission could decide whether to grant the defendants immunity from prosecution pursuant to *N. J. S. A.* 32:23–86(5) of the Waterfront Commission Act, and if so, to afford the Commission an opportunity to give notice to the appropriate officials as required by that subdivision.

On the following day (October 4, 1961) the defendants and the Commission's representative appeared before the Law Division. The court found that the defendants had obeyed the subpoenas, and that their assertion of the privilege against self-incrimination had been recognized by the Commission as a valid basis for their refusal to answer the Commission's questions. The court held that, since the defendants had complied with the judgments of the court entered June 20,

1960, they had purged themselves of contempt. However, the court also directed that the defendants should continue to be subject to the subpoenas, and that the defendants appear before the Commission on the adjourned return date (October 10, 1961).

The return date of the subpoenas was further adjourned with the consent of the parties until October 27, 1961, at which time the defendants appeared at the offices of the Commission. At the outset of this meeting, Myles J. Ambrose, Executive Director of the Commission announced, "The purpose of the meeting is to inquire into violations of the Compact in connection with a work stoppage in May, 1960, at the American Export Line piers in Hoboken, New Jersey."

The following documents were made part of the record: (1) letters (pursuant to *N. J. S. A.* 32:23–9) from the Commissioners designating Ambrose and William P. Sirignano, the Commission's General Counsel, to act in the places of Commissioners Harold R. Tyler, Jr., and David C. Thompson in the investigation wherein Murphy and Moody were subpoenaed, and to confer immunity upon them pursuant to *N. J. S. A.* 32:23–86(5); (2) copies of letters sent pursuant to *N. J. S. A.* 32:23–86(5) to the Attorneys-General of New York and New Jersey, to the District Attorney of New York County and to the Prosecutor of Hudson County, together with certificates of mailing, notifying them of the Commission's intention to confer immunity upon Murphy and Moody; and (3) letters of reply received from all of the above-named officials except the Prosecutor of Hudson County, stating that each had no objection to the Commission's proposed grant of immunity to the defendants. No reply was received from the Prosecutor of Hudson County.

Counsel for the defendants objected to the legality of the proceedings on the ground that the Commissioners could not delegate the power to grant immunity to their designees, Ambrose and Sirignano. They also challenged the adequacy of the letters of notice sent to the officials of the two States. They further demanded a statement apprising them of the

purpose and pertinency of the interrogation, contending that the Commission's failure to give them such a statement deprived them of due process of law. All these objections and demands were rejected.

Thereafter, the defendants each took the stand and, after stating his name and address, each refused to answer any further questions on the ground that his answers might tend to incriminate him. Thereupon the Commissioners' designees granted immunity to each of the defendants pursuant to *N. J. S. A.* 32:23–86(5) against prosecution in the States of New York and New Jersey concerning any transaction to which they would testify, and directed the defendants to answer each of the questions. All of the questions pertained to the defendants' knowledge or actions in connection with the May 1960 work stoppage. The defendants again refused to answer for all of the reasons stated above, and particularly because the grant of immunity did not protect them against federal prosecution.

The Commissioners' designees expressly recognized that the grant of immunity did not extend to federal prosecution, but nevertheless directed the defendants to answer, saying that there was no requirement that the immunity extend that far. Upon the defendants' further refusal to answer, the Commissioners' designees directed the attorney for the Commission to institute contempt proceedings against the defendants.

The Commission initiated the present proceedings by moving before the Law Division that the defendants "be punished as for a civil and criminal. contempt of court." Annexed to the moving papers were numerous exhibits depicting the prior history of the matter and including transcripts of the proceedings before the Commission on October 3, 1961, and October 27, 1961. In response to the Commission's motions, the court issued orders on November 1, 1961, directing the defendants to show cause why they should not be punished as for a contempt of court. The defendants filed an answer to the Commission's motions in which they denied all the allegations, and raised the following separate defenses:

(1) failure of the Commission to grant immunity against federal incrimination; (2) improper delegation by the commission of the power to confer immunity; (3) insufficient notice to the officials of the respective States; (4) failure to explicitly confer immunity as to each question asked; (5) pre-emption of the subject matter of the investigation by the Federal Labor Management Relations Act; and (6) inadequate apprisal of purpose and pertinency, resulting in a denial of due process of law. The defendants also moved for a bill of particulars or, in the alternative, an order requiring answers to interrogatories. These discovery motions sought to compel the Commission, in effect, to produce for the defendants' inspection its entire investigative files relating to the work stoppage investigation, including intra-office communications as well as communications between the Commission and any state or federal officials. Defendants also demanded a jury trial and, lastly, moved to quash the subpoenas as having been exhausted when the defendants were purged of their prior contempt.

The matter was heard before the Law Division on November 21 and 22, 1961. The court heard extensive argument from both sides on the above motions and defenses. However, the trial judge announced that he was "not going to receive any testimony," and said he was "going to decide it [the case] on the record as I've got it." Later the court reconsidered its ruling and concluded that it would receive the testimony of the defendants for the limited purpose of pinpointing their fear of possible federal incrimination. Murphy's testimony concerning the basis for his fear of federal incrimination was as follows:

"Q. What crimes could you possibly have been connected with as to result in a Federal charge against you or others, in combination with others, in conspiracy with others? A. That the American Export Lines is subsidized by the United States Government and could be sued, the union could be sued, and I could be sued, personally. Interstate commerce freight that was held up during the strike would bring in the Federal Bureau of Investigation, and the rights of watchmen

working on the piers that could be in cahoots in pilferages, and stuff like that.

Q. Also, were you aware of the fact it was the contention of the Waterfront Commission that you tried, and others together, in combination and conspiracy, to keep an individual from employment on the piers, namely, Mr. Markley? A. That's right.

Q. And was that a reason for your exercising that privilege, yourself? A. That's right."

Moody's testimony concerning the basis for his fear of federal incrimination was as follows:

"Q. And you exercised your privilege as you have just testified out of fear of incrimination of any Federal laws? A. That's right.

Q. Will you tell the Court what you feared and pinpoint them and the respect? A. First, from the Waterfront Commission, they have, what they say, the right and authority to question. Now, there's, we say, pilferage, that they say, work stoppage, we had to do with the pilferage and we had to do with the work stoppage; and the watchmen being not in the ILA, outside the ILA, that we tried to tell the watchmen what to do and what not to do, and to stop this one gentleman from getting hired on the pier. We don't do that, your Honor.

\* \* \* \* \* \* \* \*

Q. You have just testified that the American Export Lines are engaged in interstate commerce, is that correct? A. That's right.

Q. And that this stoppage, as contended by the Waterfront Commission was an illegal stoppage, was an interference with interstate commerce? A. That's right.

Q. And is that why you fear incrimination? A. That's right.

Q. And that it could lead to other evidence and tend to lead to other evidence that could possibly incriminate you? A. That's right."

The Law Division held that the Commissioners' designees had power to confer immunity on the defendants; that the Commission's letters to the officials of New York and New Jersey constituted adequate notice under the statute of its intention to confer immunity upon the defendants; that the defendants were adequately apprised of the subject matter of the investigation; and that the Commission was not required to grant the defendants immunity from federal prosecution. The court also expressed its doubt of the sincerity of the defendants' fear of federal criminal involvement. The court found the defendants guilty of both civil and criminal

contempt. The court then disposed of the various motions of the defendants, *i. e.*, the motion to quash the subpoenas, the motions for discovery, and the motion for jury trial, saying:

"Those motions were motions directed to the discretion of the Court. However, the disposition of the matter on its merits finally disposed of them, but even in the exercise of discretion, none of those motions would be granted by this Court. So all the other motions are respectfully denied."

The court deferred imposition of sentence in order to secure a presentence report from the probation department.

At the time of sentencing, the defendants' counsel urged that the court on October 4, 1961 had purged the defendants of their original contempt, and that thereafter in the proceedings before the Commission the defendants merely asserted their rights upon novel questions of law. The court noted that the defendants had refused to answer the questions in issue upon three different occasions, to wit, May 19, 1960, October 3, and October 27, 1961. Though the court believed that the defendants had a "perfect right to interpose whatever legal objections were at their command," nonetheless the court was "constrained to believe that there has to be and there now is, at least for the present, an end to these witnesses being asked these questions." The court directed the Commission to prepare an order which would set out verbatim the questions that the defendants had refused to answer and which would order the defendants to stand committed until they responsively answered the questions; and the court further fined the defendants each $50.00 and sentenced them to jail for 30 days. The court also stated that the defendants, upon answering the questions, could apply to the court for an order purging them of contempt.

On this appeal, the defendants first point out that under the *Evidence Act*, 1960 (*N. J. S. A.* 2A:84A-1 *et seq.*), the privilege against self-incrimination expressly extends to federal incrimination. They argue that since the Waterfront

Commission declared that its grant of immunity to the defendants did not and could not extend to federal prosecutions, the Commission's orders to answer were in violation of the aforesaid act.

The Commission argues that the defendants waived the privilege against self-incrimination by expressly declining to assert it at the first hearing before the Commission on May 19, 1960. The Commission further argues that since the defendants contended in the first contempt proceeding that the Commission's investigation constituted an unlawful interference with innocent conduct, *i. e.*, a labor dispute over which the National Labor Relations Board has exclusive jurisdiction, they are estopped from taking the inconsistent position in the present contempt proceeding that their testimony might implicate them in illegal conduct under federal law.

■■ Though we think the defendants should have raised all their reasons for their refusal to answer, including the privilege against self-incrimination, at the hearing before the Commission on May 19, 1960, or at least in the contempt proceedings in the Superior Court which resulted in the judgments of June 20, 1960 holding them in contempt, we think that in the circumstances of this case the defendants should not be precluded from raising the issue of the privilege against self-incrimination. The Commission recognized the defendants' right to assert the privilege at its hearing of October 3, 1961, and the trial court on October 4, 1961 also recognized their right when it purged them of their original contempt. Moreover, at its hearing on October 27, 1961, the Commission clearly recognized the defendants' right to assert the privilege when it granted them immunity against prosecution. Finally, the contentions of waiver and estoppel were never raised by the Commission in the court below and therefore it may not raise them for the first time in this court.

We return to the defendants' argument regarding the validity of the Commission's grant of immunity. The Waterfront Commission Act is an interstate compact, enacted by the States of New York and New Jersey in 1953 with the con-

450

sent of Congress, 67 *Stat.* 541, *Act of Aug.* 12, 1953, *c.* 407, in order to eliminate evil conditions on the waterfront in the Port of New York Harbor. The Compact creates the Waterfront Commission as an agency of both States, with authority to license or register workers, and for good cause to refuse licenses and registrations, and to regulate labor and hiring practices on the waterfront. In order to further the elimination of waterfront evils, the Commission is empowered to investigate waterfront practices and other matters bearing on the objectives of the Compact, and to make recommendations to the two States for the improvement of waterfront conditions and for the effectuation of the purposes of the Compact. The members of the Commission and its properly designated officers may administer oaths and issue subpoenas throughout both States to compel the attendance of witnesses, the giving of testimony, and the production of other evidence. *N. J. S. A.* 32:23–10. "Witness" is defined in the Compact as "any person whose testimony is desired in any investigation, interview or other proceeding conducted by the commission pursuant to the provisions of this act." *N. J. S. A.* 32:23–85. Failure to obey a subpoena of the Commission is made punishable by the Superior Court in New Jersey and the Supreme Court in New York "in the same manner as said failure is punishable by such court in a case therein pending." *N. J. S. A.* 32:23–62. See also, *R. R.* 4:46–5(c). For a history of this bistate legislation see *Hazelton v. Murray*, 21 *N. J.* 115 (1956); *In re Application of Waterfront Com.*, 32 *N. J.* 323 (1960).

Under *N. J. S. A.* 32:23–86(5) of the Waterfront Commission Act, the Commission has explicit statutory power to grant immunity from prosecution in order to obtain the testimony of a witness who refuses to testify upon the ground of self-incrimination. That subdivision grants the Commission the power:

"(5) To confer immunity, in the following manner: In any investigation, interview or other proceeding conducted under oath by the commission or any duly authorized officer, employee or agent thereof,

if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and, notwithstanding such refusal, an order is made upon 24 hours' prior written notice to the appropriate Attorney-General of the State of New York or the State of New Jersey, and to the appropriate district attorney or prosecutor having an official interest therein, by the unanimous vote of both members of the commission or their designees appointed pursuant to the provisions of section 3 of article III of this act, that such person answer the question or produce the evidence, such person shall comply with the order. If such person complies with the order, and if, but for this subdivision, he would have been privileged to withhold the answer given or the evidence produced by him, then immunity shall be conferred upon him, as provided for herein.

'Immunity' as used in this subdivision means that such person shall not be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order by the unanimous vote of both members of the commission or their designees appointed pursuant to the provisions of section 3 of article III of this act, he gave answer or produced evidence, and that no such answer given or evidence produced shall be received against him upon any criminal proceeding. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury or contempt committed in answering, or failing to answer, or in producing or failing to produce evidence, in accordance with the order, and any such answer given or evidence produced shall be admissible against him upon any criminal proceeding concerning such perjury or contempt.

Immunity shall not be conferred upon any person except in accordance with the provisions of this subdivision. If, after compliance with the provisions of this subdivision, a person is ordered to answer a question or produce evidence of any other kind and complies with such order, and it is thereafter determined that the appropriate Attorney-General or district attorney or prosecutor having an official interest therein was not notified, such failure or neglect shall not deprive such person of any immunity otherwise properly conferred upon him."

Section 3 of Article III, referred to in the above-quoted subdivision, reads in pertinent part as follows:

"The commission shall act only by unanimous vote of both members thereof. Any member may, by written instrument filed in the office of the commission, designate any officer or employee of the commission to act in his place as a member whenever he shall be unable to attend a meeting of the commission. * * *" *N. J. S. A.* 32:23-9.

The immunity subdivision quoted above was enacted in 1956 in New Jersey (*L.* 1956, *c.* 194) and in 1957 in New York (*New York Laws* 1957, *c.* 188) as an agreement between the two States supplementary to the Waterfront Commission Compact and amendatory thereof. This legislation was enacted pursuant to the provisions of Article XVI, Section 1 of the Compact empowering the Legislature of either State, when concurred in by the Legislature of the other, to enact amendments and supplements to the Compact. *N. J. S. A.* 32:23–70. Thus, the immunity subdivision is in effect a part of the original Waterfront Commission Compact, to which Congress gave its consent.

*N. J. S. A.* 32:23–86(5), the immunity subdivision, is substantially the same as, and in fact was patterned after, § 2447 of the New York Penal Law, McKinney's Consol. Laws, *c.* 40. In the statement appended to S-385, which became Chapter 194 of the Laws of 1956, the purpose of the then-proposed subdivision was declared as follows:

"[It] [a]uthorizes the 2 commissioners, acting unanimously, to grant immunity from criminal prosecution in connection with any commission investigation or proceeding, but only after notifying the appropriate prosecutor and Attorney-General and giving them an opportunity to point out why, in the particular case, the granting of immunity would not be in the public interest. Heretofore, a number of important investigations conducted by the commission in an effort to identify the real principals in kickback and other rackets on the waterfront have been thwarted by a valid claim of privilege against self-incrimination made by underlings. The commission could unseal such lips by granting immunity and compelling testimony from such underlings in cases where the public interest would thereby be served.

\* \* \* \* \* \* \* \*

The language of the section is practically identical with the provisions for granting immunity as codified through the efforts of the New York State Crime Commission and set forth in Section 2447 of the Penal Law of New York."

The United States Supreme Court has held that § 2447 of the New York Penal Law is valid notwithstanding a contention that it is unconstitutional to require a witness to testify upon the grant of immunity thereunder, where such witness'

testimony might be used in a federal prosecution against him. *Knapp v. Schweitzer*, 357 *U. S.* 371, 78 *S. Ct.* 1302, 2 *L. Ed. 2d* 1393 (1958). In that case Mr. Justice Frankfurter, speaking for the court, said:

"In these days of the extensive sweep of such federal statutes as the income tax law and the criminal sanctions for their evasions, investigation under state law to discover corruption and misconduct, generally, in violation of state law could easily be thwarted if a State were deprived of its power to expose such wrongdoing with a view to remedial legislation or prosecution." *Id.*, 357 *U. S.*, at *pp.* 378–379, 78 *S. Ct.*, at 1307, 2 *L. Ed. 2d*, at *p.* 1400.

In *Dunham v. Ottinger*, 243 *N. Y.* 423, 438, 154 *N. E.* 298, 302 (1926), the New York Court of Appeals, in answer to a contention that an immunity statute of that state was insufficient because it did not preclude the use of the testimony in federal criminal proceedings, said:

"It [the statute] does give ample protection against the use of such testimony in our own tribunals, and it is perfectly well established that this is a sufficient immunity; that all that the state is required to or can do is to give immunity against its own processes, and, if it has done that, as this statute does it, it has satisfied the requirements of the Constitution."

The above rule has been stated by the United States Supreme Court in *United States v. Murdock*, 284 *U. S.* 141, 149, 52 *S. Ct.* 63, 65, 76 *L. Ed.* 210, 213 (1931):

"[T]he lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute. The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination."

This rule has been recognized or followed in nearly all of the states in the nation, including New Jersey where the privilege against self-incrimination rests solely on a statutory and common law foundation. See *In re Pillo*, 11 *N. J.* 8, 16 (1952), and authorities cited therein. It is clear that prior

to the enactment of the *Evidence Act, 1960 (N. J. S. 2A:84A–1 et seq.)*, the Waterfront Commission was empowered by virtue of the immunity subdivision to compel a witness, upon whom immunity had been conferred, to testify notwithstanding a claim by the witness of a fear of federal prosecution. See *In re Pillo, supra; Nusbaum v. Newark Morning Ledger Co., 33 N. J. 419, 424 (1960).*

The defendants contend, however, that the above statement of law has been changed by virtue of the enactment of Rule 24 *(N. J. S. 2A:84A–18)* of the *Evidence Act, 1960* which expressly extends the privilege to matters which might tend to incriminate a witness under the laws of "this State, or another State or the United States," unless "it clearly appears that the witness has no reasonable cause to apprehend a criminal prosecution."[2] See *Nusbaum v. Newark Morning Ledger Co., supra*, at *p.* 424. They further point out that Rule 2(1) *(N. J. S. 2A:84A–16(1))* provides:

"(1) The provisions of article II, Privileges [which include Rule 24], shall apply in all cases and to all proceedings, places and inquiries, whether formal, informal, public or private, as well as to all branches of government and by whomsoever the same may be conducted, and none of said provisions shall be subject to being relaxed."

---

[2] It must be noted that the privilege against self-incrimination accorded to a witness by the laws of New York extends only to crimes against that state, so that a grant of state-wide immunity is sufficient to compel testimony notwithstanding a claim of federal incrimination. *Waterfront Commission v. Marchitto*, 217 *N. Y. S.* 2d 487 *(App. Div., 1st Dept.* 1961), leave to appeal denied 10 *N. Y.* 2d 813, 178 *N. E.* 2d 231 *(Ct. App.* 1961), *cert.* denied 368 *U. S.* 954, 82 *S. Ct.* 396, 7 *L. Ed.* 2d 386 (1962) ; *Lane, Commission of Investigation v. Lombardozzi*, 7 *A. D.* 2d 48, 180 *N. Y. S.* 2d 496 *(App. Div. 1st Dept.* 1958), *affirmed* 5 *N. Y.* 2d 1026, 185 *N. Y. S.* 2d 550, 158 *N. E.* 2d 250 *(Ct. App.* 1959), 6 *N. Y.* 2d 878; 188 *N. Y. S.* 2d 996, 160 *N. E.* 2d 125 *(Ct. App.* 1959), *cert* denied *sub nom. Miranda et al. v. Commission of Investigation of the State of New York*, 360 *U. S.* 930, 79 *S. Ct.* 1447, 3 *L. Ed.* 2d 1543 (1959), appeal dismissed *sub nom. Mancuso v. Commission of Investigation of the State of New York*, 361 *U. S.* 10, 80 *S. Ct.* 59, 4 *L. Ed.* 2d 50 (1959) ; see *Knapp v. Schweitzer, supra*.

The above rules obviously express a broad and liberal policy of our State to extend the scope of the privileges accorded to witnesses in this jurisdiction. However, the Legislature has recognized that the immediate implementation of such a policy might cause unforeseen conflicts with prior existing legislation, which would lead to undesirable consequences. Therefore, it has wisely chosen to proceed cautiously in a step-by-step manner, examining each piece of existing legislation which might be affected by a change in the scope of privileges, and allowing itself an opportunity to provide a specific legislative cure for any conflicts which might arise. Those existing statutes which the Legislature had already examined and wished to repeal were expressly mentioned in the *Evidence Act* as being thereby repealed. *N. J. S.* 2A:84A–45. The Legislature also provided that this court may adopt rules of evidence, *N. J. S.* 2A:84A–33, but it further provided that any such rules shall not supersede any law in conflict or inconsistent therewith unless the conflicting or inconsistent law "shall be expressly identified by footnote to any rule so adopted." *N. J. S.* 2A:84A–40. Furthermore, in order to make clear its intention to avoid any unforeseen impairment of some existing statute, the Legislature expressly provided in Rule 2(4) (*N. J. S.* 2A:84A–16(4)) :

"(4) The enactment of the rules set forth in this act or the adoption of rules pursuant hereto shall not operate to repeal any statute by implication."

In the *Report of the [Legislative] Commission to Study the Improvement of the Law of Evidence* (1956), which is an authoritative guide to the interpretation of the *Evidence Act,* 1960, it was stated at *p.* 15 that Rule 2(4) (quoted above) :

"* * * has the effect of continuing all existing statutes. This Commission feels that it is necessary to review the New Jersey statutes in detail and to specifically treat each such statute dealing with evidence. Otherwise, a wholesale repeal of many statutes, without consideration of all the implications, would result."

In view of the above, it is clear to us that although the Legislature employed a broad brush in liberally extending the scope of the rules regarding privileges, it did not intend that, without further study and action, those rules should be applied as broadly as their language would otherwise permit or require. The question before us, therefore, is whether the expansion of the privilege against self-incrimination to include incrimination under federal law was intended by the Legislature to immediately impair the powers of the Waterfront Commission to investigate evil waterfront practices and to compel testimony after a grant of immunity from statewide prosecution in New York and New Jersey. We think the Legislature had no such intention in mind when it passed the *Evidence Act,* 1960.

It is clear that in the formation of the Compact our Legislature, together with the Legislature of New York, intended to deal with joint problems existing throughout a single port area situated partly in New York and partly in New Jersey, and not with separate problems in separate ports of each State. From the standpoint of geography, commerce, and waterfront working conditions, New York Harbor is an organic whole, although politically the harbor is split between the law-making authority of the two States. Plainly, these joint problems could not be adequately dealt with except through the coordinated efforts of the two States and the United States. The situation called for unified action. As a consequence, the Waterfront Commission, a single bistate agency, was established with the consent of Congress to administer a joint legislative program throughout the Port of New York District, embracing the New York-New Jersey waterfront. Both States ceded certain governmental powers to this autonomous bistate agency. These powers, as mentioned earlier in this opinion, include the power to make appropriate investigations, subpoena witnesses, and compel testimony after a grant of immunity against prosecution in both States. See *Application of Waterfront Comm. of N. Y. Harbor,* 39 *N. J. Super.* 33 (*Law Div.* 1956). The objectives

of the Compact were to provide for uniform treatment of a unique, bistate problem. Such uniformity, in order to be effective, must be maintained throughout the life of the Compact. See Frankfurter and Landis, "The Compact Clause of the Constitution—A Study in Interstate Adjustments," 34 *Yale L. J.* 685, 698 (1925). In short, the Waterfront Commission, when acting within the orbit of the governmental responsibility which the States have expressly or by fair implication agreed to vest in it, was intended to be free from any unilateral restraint by either State which might thwart the Commission in its efforts to eliminate evil conditions in an area where there is extensive activity in international and interstate commerce. *Cf. State v. Murphy*, 36 *N. J.* 172, 186–187 (1961). Indeed, it is doubtful whether a single legislature could unilaterally impair the powers of the Waterfront Commission, even if it so desired. See *Green v. Biddle*, 8 *Wheat.* 1, 5 *L. Ed.* 547 (1823); *President, Managers, &c., v. Trenton City Bridge Co.*, 13 *N. J. Eq.* 46 (*Ch.* 1860); see also, Comment, 45 *Yale L. J.* 324, 329 (1935).

If, as defendants contend, a witness may claim the privilege against self-incrimination with respect to federal crimes notwithstanding a conferral of bistate immunity by the Commission, it would follow that there could be no effective investigation not only of the state aspects of such crimes but even of the non-criminal aspects of waterfront conditions since possible federal criminal overtones are frequently present. This is so because of the nature of waterfront activity and its constant involvement with interstate commerce and other such areas of federal jurisdiction. Since the Commission cannot grant immunity as to the federal crimes it will remain helpless. The difficulty is not merely fanciful; it might well result that investigations by the Commission would be seriously hampered and, in many cases, frustrated.

Moreover, an interpretation of the Compact which is not uniform in both States would lead to results disruptive of the investigative process of the Commission. It might mean that different witnesses would have different rights depending on

which side of the Hudson River they lived, or on which side the events in question took place. It might also mean that the same witnesses would have different rights depending on which side of the River they appear for examination or are prosecuted for contempt.[3] Certainly, our Legislature in adopting the *Evidence Act,* 1960 never intended such results.

For the above reasons, we hold that Rule 24 of the *Evidence Act,* 1960 does not entitle the defendants to refuse to testify after the Commission has conferred immunity upon them.[4]

In view of the above conclusion, it is unnecessary for us to pass upon the Commission's contention that the defendants failed to establish in the Superior Court a reasonable basis for their asserted fear of federal incrimination.

 The defendants further contend that having purged themselves of contempt under the subpoenas returnable before the Commission at its first hearing in May 1960, those

----

[3] See *Waterfront Commission v. Marchitto, supra,* where the defendant, a New Jersey resident, was successfully prosecuted in the New York courts for contempt arising out of his refusal to answer questions pertaining to his activities in New Jersey, propounded at a Commission hearing in New York City.

[4] Of course, it is not for us to say whether the Commission's grant of immunity would be honored in a federal criminal proceeding. In *Feldman v. United States,* 322 *U. S.* 487, 64 *S. Ct.* 1082, 88 *L. Ed.* 1408 (1943), rehearing denied 323 *U. S.* 811, 65 *S. Ct.* 26, 89 *L. Ed.* 646 (1944), it was held by a 4 to 3 vote that testimony of a defendant previously compelled under the sanctions of a state immunity statute could be used against him in a federal prosecution. If *Feldman* were overruled, and state-compelled testimony held inadmissible in the federal courts, a witness would be free to testify under a state immunity grant without running the risk of a subsequent federal prosecution based upon such compelled testimony. In Kroner, "Self Incrimination: The External Reach of the Privilege," 60 *Colum. L. Rev.* 816, 837, *n.* 155 (1960), the author observes: "That this [overruling *Feldman*] is not unlikely is suggested by the fact that 4 Justices now on the Court appear to favor such a result. Justices Black and Douglas were among the dissenters in *Feldman.* See 322 *U. S. at* 494 [64 *S. Ct.,* at 1085]. Mr. Chief Justice Warren, in dissent and Mr. Justice Brennan, in a concurring opinion, indicated in *Knapp v. Schweitzer* that the time was ripe for review of the *Feldman* rule. See 357 *U. S.,* at 381 [78 *S. Ct.,* at 1308]."

subpoenas were exhausted and could not be made the basis for the proceedings before the Commission on October 27, 1961. The subpoenas had been made returnable on May 18, 1960 "and at any adjourned date thereof." As mentioned earlier in this opinion, the defendants appeared before the Commission on October 3, 1961 and refused to testify upon the ground of self-incrimination. The Commission recognized the defendants' invocation of the privilege and adjourned the subpoenas until October 10, 1961, so that the Commission could decide whether to confer immunity from prosecution upon the defendants. The following day, October 4, 1961, the parties appeared before the Superior Court, which ruled that the defendants had purged themselves of their previous contempt. However, the court further ruled that the subpoenas were still in effect and noted that the Commission had adjourned the subpoenas until October 10, 1961. Counsel for the defendants agreed that they would appear at the appointed time, and the court entered an order to that effect. The hearing of October 10, 1961, was adjourned until October 27, 1961, with the consent of all the parties, at which time the defendants appeared. Since the court ordered the defendants to appear and they consented to such order, and did appear before the Commission on October 27, 1961, their contention that the power of the subpoenas to compel their appearance had been exhausted is clearly without merit.

The defendants also contend that the Commission's grant of immunity was invalid because: (1) the letters sent by the Commission to the officials of New York and New Jersey advising them of the Commission's intention to confer immunity upon the defendants were not sufficiently informative "to enable those officers to arrive at any rational judgment as to whether the case is an appropriate one for concurrence by such law officers in the Commission's proposed granting of immunity"; (2) not all such law officers having an official interest in the subject matter were notified; (3) the Commissioners' appointment of designees to confer immunity

upon the defendants was an improper delegation of power;[5] and (4) the Commission did not make the grant of immunity explicit as to each question asked.

*N. J. S. A.* 32:23–86(5) provides that the grant of immunity by the Commission shall be "upon 24 hours' prior written notice to the appropriate Attorney-General of the State of New York or the State of New Jersey, and to the appropriate district attorney or prosecutor having an official interest therein." Pursuant to this provision, the Commission mailed letters to the Attorneys-General of New York and New Jersey, the District Attorney of New York County, and the Prosecutor of Hudson County. These letters set forth the Commission's intention to confer immunity upon the defendants in an investigation "into a strike that took place at the American Export Line Terminal in Hoboken, New Jersey on May 16 through May 20, 1960." The letters further recited the history of the proceedings, including the fact that the defendants refused to answer questions concerning their participation in the strike on the grounds that their answers might tend to incriminate them. Although there is nothing in the immunity subdivision requiring receipt of replies to the letters of notice, letters were received from both Attorneys-General and from the District Attorney of New York County, informing the Commission that these officials had no objections to the proposed grant of immunity to the defendants. (No reply was received from the Hudson County Prosecutor.)

Although, as said above, the defendants contend that the Commission's letters of notice were not sufficiently informative, they do not suggest what further facts would be necessary in the circumstances. Since the letters clearly in-

---

[5] The defendants hint that the Legislature could not constitutionally delegate to the Commissioners themselves the power to grant immunity. However, they do not press this point and in any event, we would not consider it since the Attorney-General was not notified that the constitutionality of a statute was under attack. *R. R.* 4:37–2; *Bergen County Sewer Authority v. Little Ferry*, 5 *N. J.* 548, 554 (1950).

formed the officials as to the specific nature of the inquiry, and gave them an opportunity to be heard if they saw fit in order that they might persuade the Commission to withhold the granting of immunity, we think the letters were amply sufficient to comply with the statute. In any event, the immunity granted under the subdivision protects the defendants even if the law officials were not properly notified. The requirement of giving notice to the officials is not a *sine qua non* to the grant of immunity. We agree with what was said in *Commission of Investigation v. Lombardozzi, supra,* 180 *N. Y. S. 2d,* at *p.* 503, where the court was construing an immunity statute substantially identical to the one *sub judice:*

"When requested in these proceedings, the Commission informed each appellant that it had afforded the Attorney-General and the appropriate district attorney an opportunity to be heard in compliance with section 7 but refused to specify the details thereof. We find no error in that decision. The grant of immunity was absolute. It appears to have been the legislative intent that before such extensive power was exercised by the Commission, as a matter of governmental comity, it should give certain public prosecutors an opportunity to be heard to enable them to induce the Commission to withhold the granting of such immunity for reasons advanced, which might have been unknown or overlooked by the Commission. But the opportunity to be heard was not a restriction on the power. If objections were made by prosecutors and not heeded by respondent, the witness would not be the less protected. Assuming the Commission acted improvidently in the face of objections it might be subject to correction in an official forum or otherwise. Such eventual correction, regardless of what effect it might have on the Commission, individually, or as a body, could not detract from the immunity already granted. Thus, in stating that the Attorney-General and appropriate District Attorney had been afforded an opportunity to be heard, the respondent sufficiently complied with the statute. It was not for appellants to go further into the matter. When the immunity is granted it is not at the peril of the witness but at the peril of the Commission if it fails to comply with the requirements of the statute."

We find no merit in the defendants' contention that not all of the law officials "having an official interest" in the proposed grant of immunity were notified in compliance with the immunity subdivision. The defendants do not suggest which

other law officials should have been notified by the Commission. Moreover, what has been said in the preceding paragraph adequately answers this contention.

We further find no basis for the defendants' attack upon the validity of the appointment of the designees by the Commissioners to act in their places for the purpose of conferring immunity. *N. J. S. A.* 32:23–86(5) provides that immunity may be conferred by the Commissioners "or their designees appointed pursuant to the provisions of section 3 of article III of this act." In turn, this latter section (*N. J. S. A.* 32:23–9) provides that though the Commissioners can act only by unanimous vote of both members, "Any member may, by written instrument filed in the office of the commission, designate any officer or employee of the commission to act in his place as a member whenever he shall be unable to attend a meeting of the commission." Pursuant to these provisions, Commissioners Thompson and Tyler designated William P. Sirignano and Myles J. Ambrose, respectively, to act in their places as members of the Commission in the present investigation on any occasion when the Commissioners were unable to attend, and to confer immunity upon the defendants. The defendants point out that the Commissioners' instruments of designation were executed on October 13, 1961, were unlimited as to time, and were actually put to use by the designees on October 27, 1961. They argue that a Commissioner as "a gubernatorially-appointed official [should not] be permitted to strip himself of what is probably his most solemn statutory function in this indiscriminate manner."

The short answer to this contention is that here there has been no such stripping of power by the Commissioners; the designation is clearly limited to a specific investigation, for a specific purpose, and may be exercised only on those occasions which the Commissioners themselves are unable to attend. There is nothing in the record to suggest that the Commissioners were free to attend the hearing on October 27, 1961.

■ We find no substance to the defendants' final challenge to the validity of the Commission's grant of immunity, *i. e.,* that the grant was not explicit as to each question on which the defendants' claims of privilege were overruled. The immunity subdivision provides: "In any investigation, * * * if a person refuses to answer a question * * * on the ground that he may be incriminated thereby, and, notwithstanding such refusal, an order is made * * * [after due notice to appropriate officials and by the unanimous vote of both commissioners or their designees] that such person answer the question * * *, such person shall comply with the order. If such person complies with the order, and if, but for this subdivision, he would have been privileged to withhold the answers given * * *, then immunity shall be conferred upon him * * *." It is clear from the above that the immunity is conferred by operation of the statute, and not by some ritualistic statement of the examining officer. In the proceedings before the Commission on October 27, 1961, the provisions of the immunity subdivision were read and explained to the defendants and their counsel. Each time a defendant refused to answer a question on the ground of self-incrimination, the Commissioners' designees unanimously ordered the defendant to answer that question notwithstanding his claim of the privilege. This procedure complied with the statute and was therefore sufficient to cloak the defendants with the statutory immunity.

■ The defendants next contend that they were denied due process of law by the Commission's refusal to adequately apprise them as to the "purpose and pertinency" of the investigation. The Supreme Court of the United States has made clear that a witness before an investigative body is entitled to be adequately apprised of the subject matter of the investigation, and of the manner in which the questions asked are pertinent thereto, in order that he may determine whether he would be within his rights in refusing to answer. *Scull v. Commonwealth of Virginia,* 359 *U. S.* 344, 79 *S. Ct.* 838, 3 *L. Ed. 2d* 865 (1959); *Watkins v. United States,* 354

464

*U. S.* 178, 77 *S. Ct.* 1173, 1 *L. Ed.* 2d 1273 (1957) ; see *In re Application of Waterfront Com.*, 32 *N. J.* 323, 336–338 (1960).

The defendants acknowledge that when they appeared before the Commission on October 3, 1961 and thereafter, they stood apprised that the purpose of the Commission's May 1960 investigation was to inquire into the work stoppage of May 16–20, 1960 on the American Export Lines' piers in Hoboken, in order to determine whether the work stoppage constituted a threat to the port-watchman security system by preventing Markley from functioning on the piers, and whether any violations of the Compact were involved. However, the defendants contend that their right to an adequate apprisal extends beyond the above recital of purpose. They urge that they are entitled to be "apprised" of any damaging information which the Commission might have against them, and to be confronted with any accusatory witnesses, in order that they might have "an opportunity to make a rational judgment of the necessity and advisability of invoking the self-incrimination privilege"; that they should not be placed "in the position of having to decide in the dark whether or not they should incur the grievous legal and social disadvantage of invoking the privilege of self-incrimination." The defendants cite no authority for this proposition, conceding it is *"de novo* in any jurisdiction." We think this point is wholly without substance. The defendants' argument assumes that the questions propounded called for an answer which might tend to incriminate them, and as to which, therefore, they might properly assert their privilege. Their contention, in effect, is that some incriminating questions might safely be answered if they knew beforehand that the Commission did not have enough other damaging information to make a future prosecution likely. In other words, they do not wish to be put in the position where they must make the distasteful choice of invoking the privilege unless they are certain it is necessary in order to protect themselves from a future prosecution.

We know of no rule, constitutional or otherwise, which provides that when, as here, the subject matter of the inquiry and the pertinency thereto of questions have been made clear to a witness, he is entitled to be given further information before deciding whether to exercise his privilege against self-incrimination. If the Commission were thus compelled to disclose the contents of its files, then the whole investigative process would be subject to scrutiny before the investigation had even gotten under way, and in most cases the investigation would be thwarted. See *In re Application of Walerfront Com., supra,* 32 *N. J.,* at *p.* 334. Investigations to determine whether there are evil conditions on the waterfront are too important to be shackled by recalcitrant witnesses, whose privileges against self-incrimination are amply protected, merely because of some asserted disadvantage which would seem at best to be of a nebulous nature. Due process of law does not require that the niceties of personal feelings be allowed to obstruct the search for truth. *Cf. In re Vince,* 2 *N. J.* 443, 457 (1949).

In connection with the defendants' contentions with regard to the Commissioners' appointment of designees, the adequacy of notice to the law officials of both States, and their demand for apprisal as to any damaging information or accusatory witnesses, the defendants moved before the trial court for discovery in the form of interrogatories and a bill of particulars. In view of our above disposition of these contentions, however, it follows that the defendants were not entitled to any further information regarding them. The defendants' discovery motions also sought information with regard to whether the Commission's present investigation was within its statutory jurisdiction. The defendants are foreclosed from raising that issue in these proceedings, however, since it was the sole subject of the defendants' first appeal to this court, wherein we held that the Commission had jurisdiction to conduct the present investigation. *In re Application of Walerfront Comm. of N. Y. Harbor,* 35 *N. J.* 62 (1961). Therefore, the trial

court was correct in denying the defendants' motions for discovery.

Nor was there error in the trial court's denial of the defendants' demand for a jury trial. Both *R. R.* 3:8–3, having to do with criminal contempts, and *R. R.* 4:87–3, having to do with contempts generally, upon which the defendants relied in their demand, specifically provide that "[t]he court in its discretion may try the issue without a jury." See *Green v. United States,* 356 *U. S.* 165, 78 *S. Ct.* 632, 2 *L. Ed.* 2d 672 (158). We find that the trial court did not abuse its discretion in hearing the matter without a jury.

The defendants also contend that the commingling of the criminal and the civil contempt proceedings before the trial court was error, and that such error was compounded by the restrictive nature of the trial. We are satisfied that the defendants had a fair trial with regard to the issue of civil contempt, *i. e.,* whether they should be incarcerated until they have answered the questions propounded by the Commission. The defendants do not dispute the facts that were presented to the trial court, and their contentions as to the legality of the proceedings before the Commission have already been disposed of in the course of this opinion. We therefore conclude that the trial court properly found the defendants guilty of civil contempt.

However, we think that the judgments holding the defendants guilty of criminal contempt must be reversed. In *N. J. Dept. of Health v. Roselle,* 34 *N. J.* 331, 344 (1961), we expressed grave doubts whether a defendant's rights could be adequately protected in a "double-barrelled proceeding," where charges of both civil and criminal contempt are tried in a common hearing. Although the defendants did not specifically object to the dual aspects of the trial below, they did make known their desire to have an opportunity to introduce evidence on the question of intent to commit a criminal contempt. From our examination of the record, it appears that the defendants were exposed to criminal punishment without being afforded the opportunity to present evidence in their

defense, if any, and· in extenuation of the offenses charged and in mitigation of the penalties to be imposed. The trial court's refusal to hear any evidence, except for the limited purpose of pinpointing· the areas of possible federal incrimination, denied the defendants the safeguards to which they were entitled as persons charged with criminal offenses. See *Cooke v. United States,* 267 *U. S.* 517, 537, 45 *S. Ct.* 390, 69 *L. Ed.* 767, 774 (1924) ; *N. J. Dept. of Health v. Roselle, supra,* at *pp.* 338–340.

For the reasons expressed above, the judgments of the Law Division insofar as they hold the defendants guilty of criminal contempt are reversed and the matters are remanded to the Law Division for new trials. The judgments of the Law Division are affirmed insofar as they order the defendants to be incarcerated until they make "responsive answers to the aforesaid questions [set out in the judgments] before the members of the Waterfront Commission of New York Harbor, or their designees * * *, as well as until such fine[s]" ($50.00 each) have been paid.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.