55 N.J. 249 (1970)
261 A.2d 129
IN THE MATTERS OF JOSEPH ARTHUR ZICARELLI, ROBERT BASILE OCCHIPINTI, AND ANTHONY RUSSO, CHARGED WITH CIVIL CONTEMPT OF THE STATE COMMISSION OF INVESTIGATION.
JOSEPH ARTHUR ZICARELLI, ROBERT BASILE OCCHIPINTI, AND ANTHONY RUSSO, APPELLANTS,
v.
THE NEW JERSEY STATE COMMISSION OF INVESTIGATION, RESPONDENT.
The Supreme Court of New Jersey.
Argued December 15, 1969.
Decided January 20, 1970.
*255 Mr. Michael A. Querques argued the cause for appellant Zicarelli; Mr. Samuel D. Bozza argued the cause for appellant Occhipinti (Mr. Daniel E. Isles and Mr. Harvey Weissbard, of counsel and on the brief; Messrs. Querques, Isles & Weissbard, attorneys for appellant Zicarelli).
Mr. William Pollack argued the cause for appellant Russo.
Mr. Wilbur H. Mathesius and Mr. Kenneth P. Zauber argued the cause for respondent.
*256 The opinion of the court was delivered by WEINTRAUB, C.J.
Appellants refused to answer questions before the State Commission of Investigation (herein S.C.I.) and persisted in that refusal notwithstanding a grant of immunity. Upon the S.C.I.'s application to the Superior Court, each was ordered to be incarcerated until he answered. We certified their appeals before argument in the Appellate Division.

I
Appellants contend the statute creating the S.C.I. denies due process of law in violation of the Fourteenth Amendment because individuals summoned before the Commission are denied the protections accorded an accused by the Bill of Rights.[1] The argument rests upon the false premise that the role of the S.C.I. is to decide whether an individual has committed a crime and to publicize the verdict. That is not its mission.
For this reason, appellants' reliance upon Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), is misplaced. That case involved a Louisiana statute which created a body called the Labor-Management Commission of Inquiry. The Commission consisted of nine members appointed by the Governor. The Commission could act only upon referral by the Governor when, in his opinion, there was substantial indication of "widespread or continuing violations of existing criminal laws" affecting labor-management relations. Upon such referral the Commission was to proceed by public hearing to ascertain the facts, and was required *257 to determine whether there was probable cause to believe such criminal violation had occurred. Such findings were to be sent to appropriate federal or state law enforcement officials, and although not evidential in any trial, the findings were to be made public and could include conclusions as to specific individuals.
In Jenkins the trial court dismissed the complaint on motion. Three members of the Court, in an opinion by Mr. Justice Marshall, thought there was enough to warrant a hearing upon the complaint and hence reversed the judgment; two members of the Court thought the statute was invalid on its face; and the remaining three voted to affirm the trial court's judgment upholding the statute.
Mr. Justice Marshall stressed that the Commission had no role whatever in the legislative process. He pointed to the Commission's power to make public findings with respect to individual guilt of crime and cited the allegations in the complaint that the power was so used "to brand them as criminals in public" (395 U.S. at 428, 89 S.Ct. at 1852, 23 L.Ed.2d at 420). He continued that "In the present context, where the Commission allegedly makes an actual finding that a specific individual is guilty of a crime, we think that due process requires the Commission to afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights," and as well the right to call witnesses, subject to reasonable restrictions. (395 U.S. at 429, 89 S.Ct. at 1852, 23 L.Ed. 2d at 421). Finally the opinion emphasized that it did not hold that appellant was entitled to declaratory or injunctive relief but only that he was entitled to a chance "to prove at trial that the Commission is designed to and does indeed act in the manner alleged in his complaint, and that its procedures fail to meet the requirements of due process." (395 U.S. at 431, 89 S.Ct. at 1854, 23 L.Ed.2d at 422).
It should be stressed that both the plurality opinion and the dissenting opinion unreservedly reaffirmed Hannah v. *258 Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), which had rejected a similar attack upon the statute creating the Civil Rights Commission. Distinguishing Hannah, Mr. Justice Marshall in Jenkins said (395 U.S. at 426, 427, 89 S.Ct. 1851, 23 L.Ed.2d at 419-420):
"The appellants in Hannah were persons subpoenaed to appear before the Civil Rights Commission in connection with complaints about deprivations of voting rights. They objected to the Civil Rights Commission's rules about nondisclosure of the complainants and about limitations on the right to confront and cross-examine witnesses. This Court ruled that the Commission's rules were consistent with the Due Process Clause of the Fifth Amendment. The Court noted that `"[d]ue process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts.... Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account.' 363 U.S., at 442, 80 S.Ct., at 1515, 4 L.Ed.2d, at 1321.
In rejecting appellants' challenge to the Civil Rights Commission's procedures, the Court placed great emphasis on the investigatory function of the Commission:
`[I]ts function is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property. In short, the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its existence is to find facts which may subsequently be used as the basis for legislative and executive action.' 363 U.S., at 441, 80 S Ct., at 1514. [4 L.Ed.2d, at 1320].
The Court noted that any adverse consequences to those being investigated, such as subjecting them to public opprobrium, were purely conjectural, and, in any case, were merely collateral and `not * * * the result of any affirmative determinations made by the Commission * * *.' 363 U.S., at 443, 80 S.Ct., at 1515 [4 L.Ed.2d, at 1322]."
The S.C.I. is in no sense an "accusatory" body within the meaning of Jenkins. Rather, in words which Jenkins repeated from Hannah, the purpose of the S.C.I. is "to find facts which may subsequently be used as the basis for legislative and executive action." This plainly appears from a review of the statute.
*259 The S.C.I. consists of four members, two appointed by the Governor and one each by the President of the Senate and the Speaker of the General Assembly. N.J.S.A. 52:9M-1. Section 2 of the statute reads:
"The commission shall have the duty and power to conduct investigations in connection with:
a. The faithful execution and effective enforcement of the laws of the State, with particular reference but not limited to organized crime and racketeering;
b. The conduct of public officers and public employees, and of officers and employees of public corporations and authorities;
c. Any matter concerning the public peace, public safety and public justice."
Section 3 provides:
"At the direction of the Governor or by concurrent resolution of the Legislature the commission shall conduct investigations and otherwise assist in connection with:
a. The removal of public officers by the Governor;
b. The making of recommendations by the Governor to any other person or body, with respect to the removal of public officers;
c. The making of recommendations by the Governor to the Legislature with respect to changes in or additions to existing provisions of law required for the more effective enforcement of the law."
Section 4 requires the S.C.I. to investigate any department or State agency at the direction or request of the Legislature or the Governor or such department or agency. Upon the request of the Attorney General, a county prosecutor or any other law enforcement official, the S.C.I. shall cooperate with, advise and assist them in the performance of their official powers and duties. Section 5. The S.C.I. shall cooperate with federal officials in the investigation of violations of federal laws within the State, section 6, and may consult and exchange information with officers of other States, section 7, and whenever it shall appear to the Commission that there is cause for the prosecution for a crime, or for the removal of a public officer for misconduct, the Commission shall refer the evidence to the officials authorized *260 to conduct the prosecution or to remove the public officer. Section 8.
The legislative mission of the S.C.I., evident in section 3 quoted above, is emphasized by section 10 which reads:
"The commission shall make an annual report to the Governor and Legislature which shall include its recommendations. The commission shall make such further interim reports to the Governor and Legislature, or either thereof, as it shall deem advisable, or as shall be required by the Governor or by concurrent resolution of the Legislature."
Section 11 does provide that
"By such means and to such extent as it shall deem appropriate, the commission shall keep the public informed as to the operations of organized crime, problems of criminal law enforcement in the State and other activities of the commission."
but section 11 does not require the S.C.I. to make and publicize findings with respect to the guilt of specific individuals and thus does not invite the problem involved in Jenkins. In other words, the S.C.I. can respect the demands of due process without disobeying the letter or the spirit of the statute. Nor does the discretion given by section 12 to hold public hearings in any way mandate an infraction of any constitutional right. Under the statute the S.C.I. may, and under the Constitution it must, work within basic limits.
We add that nothing occurred in the present matter which suggests the S.C.I. intends to transgress those limits. The S.C.I. met the provisions of the Code of Fair Procedure (L. 1968, c. 376), N.J.S.A. 52:13E-1 to 10. A copy of that statute was served upon each appellant with the subpoena, and the subpoena contained a sufficient statement of the subject of the investigation.[2]N.J.S.A. 52:13E-2. The *261 right to have counsel present and to receive his advice, N.J.S.A. 52:13E-3, was respected. The hearing was private. There has been no trace of a purpose to deny due process.
In sum, then, we have a typical commission created to discover and to publicize the state of affairs in a criminal area, to the end that helpful legislation may be proposed and receive needed public support. That the commission may also aid law enforcement by gathering evidence of crime and transmitting it to the appropriate agency for evaluation or prosecution does not militate against the power of the Legislature to seek the facts for its own purposes through such a commission. We do not suggest that a commission whose role was solely to aid the executive branch by ferreting out evidence of guilt for transmittal to the executive officers would be barred by the Federal Constitution. No provision of that instrument stands in the way. Nor do we understand appellants to say there is. The federal attack under the present point is based on the due process clause, and the result does not turn upon whether the agency is characterized as "legislative" or "executive" or both. Rather the question is whether the agency, whatever its classic nature in the context of separation of powers, has an accusatory role, and if so, whether individual rights pertinent to an accusatory function have been denied. As to this, the answer is that the role of the S.C.I. is not accusatory and the rights accorded the individuals concerned are appropriate and adequate in the light of the agency's mission and powers.
We add that the United States District Court for the District of New Jersey rejected the same attack in Sinatra v. New Jersey State Commission of Investigation, decided January 9, 1970.

*262 II
Appellants contend the statute violates Article III, ¶ 1, which reads:
"The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."
The gist of the complaint seems to be that the statute's division of the power of appointment between the legislative and executive branches offends the provisions of the State Constitution dealing with appointments to office.
Appellants say that if the S.C.I. is a legislative agency, the statute must fall because the power of appointment of two of the commissioners is allocated to the Governor. The power to appoint, as such, is not the special power of any one branch. Ross v. Board of Chosen Freeholders of County of Essex, 69 N.J. Law 291, 294-296 (E. & A. 1903). The question then is whether there is something in the facts of this case which nonetheless requires the appointments to be made by the Legislature itself. We see no fundamental incongruity within the broad principle of Article III, ¶ 1, quoted above, in permitting the Governor to appoint to a legislative agency. The Governor is a party to the legislative process. He is required to address the Legislature upon "the condition of the State" and to "recommend such measures as he may deem desirable." Art. V, § I, ¶ 12. All bills must be presented to him for his approval or disapproval. Art. V, § I, ¶ 14. Hence it cannot offend the policy of Art. III, ¶ 1, to authorize the Governor to appoint to a "legislative" commission.
Nor does any constitutional provision dealing with the specific subject of appointments forbid that course. On the contrary, the stated restriction with respect to appointments is upon the legislative branch alone. Art. IV, § V, ¶ 5, provides that "Neither the Legislature nor either house *263 thereof shall elect or appoint any executive, administrative or judicial officer except the State Auditor." See Richman v. Neuberger, 22 N.J. 28 (1956); Richman v. Ligham, 22 N.J. 40 (1956). Hence, if the S.C.I. is a legislative commission within the meaning of our State Constitution, no difficulty resides in the circumstance that the Governor shares the appointing power.
The alternative argument is that the S.C.I. must be deemed to be an executive agency and therefore the Legislature may not appoint because of the affirmative restriction upon a legislative appointment of any executive or administration officer contained in Art. IV, § V, ¶ 5, referred to above. In contending the S.C.I. is "executive" appellants stress the authority given the S.C.I. by the statutory provisions quoted in Point I to investigate at the request and in aid of the Governor or officers within his branch of government.
The power to investigate reposes in all three branches. Eggers v. Kenny, 15 N.J. 107, 114-115 (1954). And, absent a threat to the essential integrity of the executive branch, see David v. Vesta Co., 45 N.J. 301, 326 (1965), the Legislature may investigate official performance within the executive branch, for it is the responsibility of the Legislature to legislate with respect to executive offices and their powers and duties. This being an appropriate area for legislative inquiry, it is of no significance that Art. V, § IV, ¶ 5, also empowers the Governor to investigate official performance within his department.
A separation-of-powers issue would arise only if the Legislature authorized the S.C.I. to go beyond investigation and to take action which invades an area committed exclusively to another branch. So, for example, if the S.C.I. were empowered to indict or to adjudicate charges of violation of our criminal laws, there would be an encroachment upon the judicial branch, David v. Vesta Co., supra, 45 N.J. at 326-327, and if the S.C.I. were authorized itself to prosecute criminal charges, the executive power would be involved. *264 But the S.C.I. does none of this. Its investigations will at most yield material which may also be of interest to executive officials and be referred to them for handling. This being so, the S.C.I. is not vested with authority peculiarly executive in the sense of the separation-of-powers doctrine. Hence it cannot be said that the S.C.I. is an executive agency within the meaning of the provision barring legislative appointments of executive or administrative officers.
Nor does the statute offend Art. IV, § V, ¶ 2, which reads:
"The Legislature may appoint any commission, committee or other body whose main purpose is to aid or assist it in performing its functions. * * *"
This provision appears to focus upon the power of appointment, and authorizes the Legislature to exercise that power if the "main purpose" is to aid or assist that branch of government and inferentially to deny that power if the "main purpose" is to aid or assist another branch.
We must assume the Legislature intended to abide by the Constitution and that the "main purpose" was to aid the legislative branch. That the S.C.I. is directed to investigate at the request of the Governor or agencies within his department does not point the other way. Notwithstanding the executive aid which may ensue, the legislative interest persists, for the legislative power touches all things, subject only to restraints the Constitution imposes. It being within the power of the Legislature to appoint a commission to inquire into performance in public office, to trace the tentacles of crime in the public and the private sectors, and to inform the Legislature and the public to the end that the sufficiency of existing legislation or the need for remedial measures may be known, the legislative purpose remains dominant notwithstanding that the product of investigations will be available to the executive branch. The separation-of-powers doctrine contemplates that the several branches will cooperate to the end that government will succeed in its *265 mission. It is consistent with the legislative responsibility to provide that a legislative agency shall investigate an area of legitimate legislative interest upon an executive request or shall alert law enforcement agencies, state and federal, with respect to criminal events it uncovers. Hence the assistance to the executive branch, state and federal, does not dispute the premise that the "main purpose" of the S.C.I. is legislative.

III
Appellants contend the immunity provision of the statute violates the Fifth Amendment guarantee that no person "shall be compelled in any criminal case to be a witness against himself."
N.J.S.A. 52:9M-17(b) provides that a person complying with the S.C.I.'s order to answer "shall be immune from having such responsive answer given by him or such responsive evidence produced by him, or evidence derived therefrom used to expose him to criminal prosecution or penalty or to a forfeiture of his estate." Several objections are raised to the constitutional sufficiency of this immunity.
The first is that the statute does not grant a "transactional" immunity, i.e., from prosecution for the offense to which the compelled testimony relates, but rather grants only a "testimonial" immunity, i.e., protection against the use of the compelled testimony and the fruits thereof leaving the witness subject to trial upon the basis of other evidence the State acquires independently of that testimony. We believe the statute need go no further.
Appellants rely upon Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). There the statute protected the witness from the use of the evidence obtained from him but did not forbid the use of other evidence to which the witness's testimony might lead. The Court made it plain that the Fifth Amendment would not be satisfied unless the witness were also shielded from the evidence the prosecution uncovered by reason of the leads obtained from *266 the witness, but in its final statement the Court spoke in terms which could be found to be more demanding. It said (142 U.S. at 585-586, 12 S.Ct. at 206, 35 L.Ed. at 1122):
"We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating questions put to him can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates. In this respect, we give our assent rather to the doctrine of Emery's Case, [107 Mass. 172] in Massachusetts, than to that of People v. Kelly, [24 N.Y. 74] in New York; and we consider that the ruling of this court in Boyd v. United States, supra, [116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746] supports the view we take. Section 860, moreover, affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party."
The last sentence in this quotation observes that the statute did not protect against use of the fruit of the compelled testimony, and thus states a narrower basis for decision than the opening proposition that a statute will not suffice unless it grants an absolute immunity from prosecution.
The application of the self-incrimination clause to a defendant in a criminal proceeding is evident and simple, but the Constitution is read to protect as well a witness in every proceeding, and here difficulties arise. When the private interests of a witness are served by his silence, it is at the expense of litigants who need his testimony or at the expense of the State if the witness thereby withholds what the public needs to know in a judicial or legislative inquiry. Discordant values are involved, and the task is to reconcile their demands.
One approach could be to require the witness to answer and then to shield him from the use of the testimony thus compelled. We did that in a setting in which the good faith of the asserted fear of incrimination could not be *267 tested. State v. De Cola, 33 N.J. 335 (1960). In general, however, the courts chose to permit the witness to refuse to answer, but since, if that right were absolute, the State could be denied evidence it needed for public prosecutions or investigations, the competing values were adjusted by requiring the witness to testify if the State conferred an immunity which would leave him no worse off than if his claim to silence had been allowed. On the face of things, an immunity against prosecution would exceed what the Fifth Amendment protects, for the Fifth Amendment protects the witness only with respect to what the witness himself can furnish and not from evidence from other sources.
At the time Counselman was decided, the immunity question concerned only the jurisdiction which sought to compel testimony. Counselman dealt with a federal statute and with the restraint the Fifth Amendment imposed upon the federal government. Since then the Fifth Amendment has been found to apply to the States as well, and in addition the view has taken hold that evidence the federal government or a State obtains by forbidden compulsion may not be used by either jurisdiction. In that setting, the scope of the required immunity assumes new significance. If the immunity must protect against prosecution with respect to any offense, both state and federal, to which the testimony relates, the States would be unable to compel testimony no matter how urgent the public need since they could not immunize a witness from federal prosecution. And although the Congress can, in furtherance of federal investigations, bar state prosecutions, still, the State's responsibility and interest in criminal matters being usually more pervasive and demanding, it might be too high a price to pay. See Knapp v. Schweitzer, 357 U.S. 371, 378-379, 78 S.Ct. 1302, 2 L.Ed.2d 1393, 1400 (1958). In this new setting, the more acceptable solvent is to protect the witness against the use of his compelled testimony by both jurisdictions but with each remaining free to prosecute on the basis of evidence independently obtained.
*268 The problem was accordingly resolved in those terms in Murphy v. Waterfront Commission of New York Harbor, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). The case involved a New Jersey statute which granted immunity from state prosecution but of course did not purport to protect the witness with respect to federal offenses. On the basis of prior decisions of the United States Supreme Court, we held the statute was valid even though the witness remained subject to federal prosecution. In re Application of Waterfront Commission of N.Y. Harbor, 39 N.J. 436 (1963). The United States Supreme Court agreed that the statute should be upheld, but upon the ground that the witness would indeed be protected in a federal prosecution by virtue of the Fifth Amendment itself. This conclusion had to reject the thesis that the Fifth Amendment required an immunity from prosecution rather than an immunity from the use of the coerced testimony. Indeed, Murphy read Counselman v. Hitchcock to have denounced the statute there involved, not because it failed to provide for immunity against prosecution, but because it did not protect the witness from the use of the fruit of the compelled testimony (378 U.S. at 78-79, 84 S.Ct. 1594, 12 L.Ed.2d at 694-695). Murphy concluded in these words (378 U.S. at 79, 84 S.Ct. at 1609, 12 L.Ed.2d at 695):
"* * * we hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *269 That Murphy rejected the view that the Fifth Amendment requires a grant of immunity from prosecution was emphasized in the concurring opinion of Mr. Justice White (378 U.S. at 93, 84 S.Ct. 1594, 12 L.Ed.2d at 703).
In Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), the Court, in summarizing Counselman v. Hitchcock, did include a reference in Counselman to "absolute immunity against future prosecution for the offence to which the question relates" but this issue was not in focus, and the opinion did not stop there, but rather pointed out that the immunity statute before it did not protect against the use of the compelled statement as evidence in all situations nor against the use of the leads if furnished (382 U.S. at 80, 86 S.Ct. 194, 15 L.Ed.2d at 172). The question whether an immunity against compelled testimony and its fruits is enough was left open in Stevens v. Marks, 383 U.S. 234, 244, 86 S.Ct. 788, 15 L.Ed.2d 724, 732 (1966). But in Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), the Court said that "Answers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruit in connection with a criminal prosecution against the person testifying," citing both Counselman and Murphy (392 U.S. at 276, 88 S.Ct. at 1915, 20 L.Ed.2d at 1085). Thus the view of Murphy was reasserted.
We are satisfied that the Fifth Amendment does not require immunity from prosecution. An immunity of that breadth exceeds the protection the Fifth Amendment accords. More importantly, to find that demand in the Fifth Amendment would in practical terms deny state government access to facts it must have to meet its duty to secure the well-being of all the citizens. We heretofore deemed the Constitution to require immunity against use of testimony rather than immunity from prosecution, see State v. Spindel, 24 N.J. 395, 404-405 (1957), and recently our Legislature, in adopting the Model State Witness Immunity Act, substituted an *270 immunity from use for an immunity from prosecution. See In re Addonizio, 53 N.J. 107, 114-115 (1968).
There is a difference in that Murphy dealt with a federal-state setting whereas we are here dealing with the claim that our statute does not protect a witness from prosecution under our state law. But the question in both is the same, i.e., what immunity the Fifth Amendment requires in exchange for compulsion to answer. The values involved are the same. We see no sensible basis for a different answer. Gardner v. Broderick treated the issue as one and the same, citing both Counselman and Murphy. Murphy held and Gardner repeated that the Fifth Amendment requires protection only from the use of the compelled testimony and the leads it furnishes, and that protection our statute expressly provides. See United States ex rel. Ciffo v. McClosky, 273 F. Supp. 604 (S.D. N.Y. 1967); Application of Longo, 280 F. Supp. 185 (S.D.N.Y. 1967).
The remaining questions concerning self-incrimination may be disposed of quickly. It is contended the statutory immunity is inadequate because it does not protect a witness with respect to a prosecution in a sister State or in a foreign land. As to a sister State, it seems clear that if the Fifth Amendment requires protection against the use of the testimony by a sister State, the Amendment itself will provide that protection. Murphy can mean no less. United States ex rel. Ciffo v. McClosky, supra, 273 F. Supp. at 606; Application of Longo, supra, 280 F. Supp. 185; cf. In re Flanagan, 121 U.S. App. D.C. 368, 350 F.2d 746, 747 (1965). As to a foreign land, even if Murphy means that liability under foreign law is now relevent, the danger in the case before us is too imaginary and unsubstantial to sustain a refusal to answer. See Murphy, 378 U.S. at 67-68, 84 S.Ct. 1594, 12 L.Ed.2d at 688.
Nor do we see substance to the complaint that our statute protects the witness only with respect to "responsive" answers or evidence. The limitation is intended to prevent a witness from seeking undue protection by volunteering what *271 the State already knows or will likely come upon without the witness's aid. The purpose is not to trap. Fairly construed, the statute protects the witness against answers and evidence he in good faith believed were demanded.

IV
The orders under review provide that appellants shall be incarcerated until they answer the questions they refused to answer. Appellants contend the statute authorizes only a penal prosecution for contempt of the Commission, for which a fixed sentence must be imposed.
With reference to "contempt" of court, we have tried to distinguish sharply between (1) the public offense, i.e., "contempt," for which the court may punish the offender and (2) the injured litigant's right to apply for relief to satisfy his private claim arising out of the same offending act or omission. New Jersey Department of Health v. Roselle, 34 N.J. 331 (1961); In re Application of Waterfront Comm. of N.Y. Harbor, supra, 39 N.J. at 466; In re Carton, 48 N.J. 9, 19-24 (1966); In re Buehrer, 50 N.J. 501, 515-516 (1967). The procedure and rights of the person concerned depend very much upon the purpose of the proceeding, and hence our rule of court prescribes the processes carefully to the end that he may know at once whether he is to meet a penal charge or the civil claim of a litigant, and may be afforded the rights appropriate to the proceeding. R. 1:10-1 to 5.
It would be helpful if legislative draftsmen abided by our semantics, but we cannot insist that they shall. Our responsibility remains to find and enforce the legislative intent.
N.J.S.A. 52:9M-17 (b) provides that a person given immunity "may nevertheless be prosecuted for any perjury committed in such answer or in producing such evidence, or for contempt for failing to give an answer or produce evidence in accordance with the order of the commission. * * *" Appellants insist this language contemplates a penal *272 prosecution and nothing else. But the sense of the situation goes strongly against that limitation, for the mission of the S.C.I. is to obtain facts for the Legislature and the mere punishment of a recalcitrant witness would not achieve that end.
We can think of no reason why the Legislature would want to permit a witness to block the inquiry if he is willing to accept a penalty. Mindful, as we are, that the expression "prosecution for contempt" has been used widely to describe a proceeding arising out of contumacy, whether the object of the proceeding is to compel compliance or to punish for noncompliance or both, we must seek the legislative design in that light, nothwithstanding that the terms employed are not the ones we prefer. Here we have no doubt that the Legislature intended the S.C.I. to obtain the facts, whatever the wish of the person subpoenaed. The very provision for a grant of immunity repels the notion that a witness may choose to be silent for a price.
Nor is it critical whether the statutory language fits snugly within our rule of court relating to judicial proceedings in aid of subpoenas of a public officer or agency. R. 1:9-6. Subsection (a) deals with ex parte applications for compliance, subsection (b) with applications for compliance made on notice, and (c) with applications to "punish" where a statute authorizes that course. These provisions were intended to reflect statutory provisions of which the draftsmen of the rule were aware. Needless to say, the rule does not mean that the judiciary will withhold its hand unless the statute falls within the language of the rule. R. 1:1-2 provides that "In the absence of rule, the court may proceed in any manner compatible" with the purpose "to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Here appellants were plainly informed that the objective of the proceedings was to have them jailed until they complied with the order of the S.C.I. There can be and there is no complaint on that score.
*273 We should add some further observations. The section of the statute here involved deals with defiance of the order of the S.C.I. itself rather than with defiance of an order obtained by the agency from a court. We see no difficulty in the circumstance that the statute does not all for an intermediate order by a court to be followed by enforcement of the court's mandate, but we point out that the absence of such an intermediate step does not deny a witness the opportunity to have the court pass upon the validity of the agency's order to answer. There was no misunderstanding here in that regard. Appellants were heard fully upon the propriety of the questions. They do challenge the validity of certain questions but there is no charge that the hearing before the trial court upon those objections was inadequate.

V
The remaining issues warrant little more than mention.
Zicarelli and Occhipinti charge that the questions put to them offended their freedom of association guaranteed by the First Amendment. Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), which they cite, dealt with a legislative inquiry into political associations. Here the questions relate to an allegedly massive criminal organization, and to the witness's associations in that context. The subject matter is incontestably criminal and the interest of the State is manifest. We see no affront to the values protected by the First Amendment.
Appellants complain that the questions "sought to probe into the most secret recesses of the witness' minds and to expose these private thoughts to public view," and this they say is barred by the Fourth Amendment, alone or in conjunction with the First and Fifth Amendments. Granted the right of the Legislature to inquire, the pertinency of the questions and the sufficiency of the immunity with respect to self-incrimination, all of which must be accepted for the *274 immediate purpose, the proposition advanced, simply stated, is that the Constitution prohibits a subpoena to a mere witness. It is plainly frivolous.
Appellants' reliance upon the Sixth Amendment appears to raise no issue beyond the due process question discussed in "I" above.
Their further claim that if the statute is valid, it nonetheless has been so applied or implemented as to violate the Constitution has no basis.
The trial court properly refused to permit an examination of the Executive Director of the S.C.I. as to whether the agency already had the information it sought from appellants or whether the S.C.I. was following a path revealed by illegal wire-taps or bugging. As to the first, it would be an unwarranted interference with the legislative branch thus to superintend its exercise of its constitutional authority to investigate. It is difficult to conceive of a showing which would justify that course. Surely nothing before us suggests a serious issue in that regard.
With respect to the effort to learn whether evidence illegally obtained prompted the legislative investigation or the questions put to appellants, they cite no authority for the extraordinary proposition that such illegality will taint the legislative process. The suppression of the truth because it was discovered by a violation of a constitutional guarantee is a judge-made sanction to deter insolence in office. It is invoked in penal proceedings, and then only at the behest of a defendant whose right was violated. Farley v. $168,400.97, 55 N.J. 31, 47 (1969). Even there, the wisdom of a suppression of the truth is not universally acknowledged. Farley, supra, 55 N.J. at 50. Appellants ask us to go further, and to suppress the truth on behalf of a mere witness, to the end that he may choose to be silent. Still more, appellants ask that we visit the sanction upon the legislative process, even though that process cannot result in a judgment against them. Pressed relentlessly and without regard to all other values, the sanction thesis could indeed deny the Legislature *275 access to facts, and even taint a statute adopted in response to facts illegally revealed, but we think such an extension would be absurd.
Finally, Russo asserts the questions put to him are improper because they allegedly enter an area in which he has been convicted of perjury. The conviction, as described in his brief, was for perjury in denying to a grand jury that he had said to a policeman that he, Russo, had the Mayor and some councilmen of the City of Long Branch "in his pocket." We do not see a problem. His testimony before the S.C.I. could not be used in a retrial of that perjury charge. Nor do the questions here involved include the one which led to the conviction, so as to raise the prospect that if Russo repeats his former testimony he will be indicted on a fresh charge of perjury. We need not anticipate issues such an indictment might raise.
The orders are affirmed.
For affirmance  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN.  7.
For reversal  None.
NOTES
[1] The S.C.I. contends that appellant Zicarelli is estopped to argue the constitutionality of the statute in its entirety or of the immunity provision because he was defeated on both scores in a proceeding in the United States District Court for the District of New Jersey and withdrew his appeal from the judgment there entered. We pass this objection since the issue must be met at the behest of the other appellants, and even as to Zicarelli "collateral estoppel" would not be a satisfying basis for decision.
[2] It read:

"Whether the laws of New Jersey are being faithfully executed and effectively enforced in the City of Long Branch, New Jersey, with particular reference to organized crime and racketeering; whether public officers and public employees in the City of Long Branch and in Monmouth County where it is located, have been properly discharging their duties with particular reference to law enforcement and relations to criminal elements; and whether and to what extent criminal elements have infiltrated the political, economic and business life of those areas."